**BAKER BOTTS L.L.P.**
Kurt M. Pankratz (SBN 24013291) (*Pro Hac Vice*)
kurt.pankratz@bakerbotts.com
Chad C. Walters (SBN 24034730) (*Pro Hac Vice*)
chad.walters@bakerbotts.com
James Williams (SBN 24075284) (*Pro Hac Vice*)
james.williams@bakerbotts.com
Harrison Rich (SBN 24083730) (*Pro Hac Vice*)
harrison.rich@bakerbotts.com
Clarke Stavinoha (SBN 24093198) *(Pro Hac Vice)*
clarke.stavinoha@bakerbotts.com
2001 Ross Avenue, Suite 700
Dallas, TX 75201
Tel: (214) 953-6500
Fax: (214) 953-6503

Wayne O. Stacy (SBN 341579)
wayne.stacy@bakerbotts.com
101 California Street, Suite 3600
San Francisco, CA 94111
Tel: (415) 291-6206
Fax: (415) 291-6306

Jennifer C. Tempesta (SBN 4397089) (*Pro Hac Vice*)
jennifer.tempesta@bakerbotts.com
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-2500
Fax: (212) 408-2501

Attorneys for Plaintiffs
SYMANTEC CORPORATION
and SYMANTEC LIMITED.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO**

| | |
|---|---|
| SYMANTEC CORPORATION and SYMANTEC LIMITED, <br><br> Plaintiffs, <br><br> vs. <br><br> ZSCALER, INC, <br><br> Defendant. | Case No. 3:17-CV-04414-JST <br><br> **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** <br><br> Judge: Hon. Jon S. Tigar |

BAKER BOTTS L.L.P.

Plaintiffs Symantec Corporation and Symantec Limited ("Symantec" or "Plaintiffs") file this complaint for patent infringement against Defendant Zscaler, Inc. ("Zscaler" or "Defendant") and in support thereof allege and aver as follows:

## NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., specifically including 35 U.S.C. § 271.

## THE PARTIES

2.     Symantec Corporation is a corporation organized under the laws of the State of Delaware, with a principal place of business at 350 Ellis Street, Mountain View, California.

3.     Symantec Limited is a company organized under the laws of the Ireland, with a principal place of business at Ballycoolin Business Park Blanchardstown, Dublin, Co. Dublin 15, Ireland.

4.     On information and belief, Zscaler is a corporation organized under the laws of the State of Delaware, with a principal place of business at 110 Rose Orchard Way, San Jose, California.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     Zscaler is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware.  In addition, on information and belief, Zscaler regularly transacts business in Delaware, including but not necessarily limited to offering products or services that infringe one or more of Symantec's asserted patents to customers located in Delaware and/or for use in Delaware.  Accordingly, this Court may properly exercise personal jurisdiction over Zscaler.

7.     Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and/or 1400(b) at least because Zscaler is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware.  In addition, on information and belief, Zscaler has committed acts of infringement in the State of Delaware, including but not necessarily limited to

BAKER BOTTS L.L.P.

1  offering products or services that infringe one or more of Symantec's asserted patents to

2  customers located in Delaware and/or for use in Delaware.

3  **THE PATENTS-IN-SUIT**

4  8.    U.S. Patent No. 6,285,658 ("the '658 Patent"), titled "System for Managing Flow

5  Bandwidth Utilization at Network, Transport and Application Layers in Store and Forward

6  Network," was issued by the United States Patent and Trademark Office ("USPTO) on Sept. 4,

7  2001. Symantec is the owner by assignment of the entire right, title and interest in and to the

8  '658 Patent, including the sole and undivided right to sue for infringement. A true and correct

9  copy of the '658 Patent is attached hereto as Exhibit A.

10  9.    U.S. Patent No. 7,360,249 ("the '249 Patent"), titled "Refining Behavioral

11  Detections for Early Blocking of Malicious Code," was issued by the USPTO on Apr. 15, 2008.

12  Symantec is the owner by assignment of the entire right, title and interest in and to the '249

13  Patent, including the sole and undivided right to sue for infringement. A true and correct copy

14  of the '249 Patent is attached hereto as Exhibit B.

15  10.    U.S. Patent No. 7,587,488 ("the '488 Patent"), titled "Dynamic Background

16  Rater for Internet Content," was issued by the USPTO on Sept. 8, 2009. Symantec is the owner

17  by assignment of the entire right, title and interest in and to the '488 Patent, including the sole

18  and undivided right to sue for infringement. A true and correct copy of the '488 Patent is

19  attached hereto as Exhibit C.

20  11.    U.S. Patent No. 8,316,429 ("the '429 Patent"), titled "Methods and Systems for

21  Obtaining URL Filtering Information," was issued by the USPTO on Nov. 20, 2012. Symantec

22  is the owner by assignment of the entire right, title and interest in and to the '429 Patent,

23  including the sole and undivided right to sue for infringement. A true and correct copy of the

24  '429 Patent is attached hereto as Exhibit D.

25  12.    U.S. Patent No. 8,316,446 ("the '446 Patent"), titled "Methods and Apparatus for

26  Blocking Unwanted Software Downloads," was issued by the USPTO on Nov. 20, 2012.

27  Symantec is the owner by assignment of the entire right, title and interest in and to the '446

28

BAKER BOTTS L.L.P.

Patent, including the sole and undivided right to sue for infringement.  A true and correct copy of the '446 Patent is attached hereto as Exhibit E.

13.     U.S. Patent No. 8,402,540 ("the '540 Patent"), titled "Systems and Methods for Processing Data Flows," was issued by the USPTO on March 19, 2013.  Symantec is the owner by assignment of the entire right, title, and interest in and to the '540 Patent, including the sole and undivided right to sue for infringement.  A true and correct copy of the '540 Patent is attached hereto as Exhibit F.

14.     U.S. Patent No. 9,525,696 ("the '696 Patent"), titled "Systems and Methods for Processing Data Flows," was issued by the USPTO on Dec. 20, 2016.  Symantec is the owner by assignment of the entire right, title, and interest in and to the '696 Patent, including the sole and undivided right to sue for infringement. A true and correct copy of the '696 Patent is attached hereto as Exhibit G.

15.     The '658 Patent, '249 Patent, '488 Patent, '429 Patent, '446 Patent, '540 Patent, and '696 Patent are referred to herein collectively as the Patents-in-Suit.

## BACKGROUND OF THE DISPUTE

### Symantec Is a Pioneer in Fundamental Networking and Security Technology

16.     Since its inception, Symantec has been providing software products to enhance its customers' computing productivity, security and reliability.  Symantec was founded in 1982 by computer scientist Gary Hendrix with a grant from the National Science Foundation.  Originally focused on natural language processing and artificial intelligence-related products, Symantec grew throughout the 1980s through organic growth and strategic acquisitions in the computer software field.  In 1990, Symantec merged with Peter Norton Computing, a developer of various consumer antivirus and data management utilities.  At the time, Symantec was already a market leader for Macintosh antivirus and utilities software and had already begun development of a DOS-based antivirus program, making the merger with Norton strategically advantageous. Norton AntiVirus was launched in 1991.  In 1993, the Norton product group accounted for 82% of Symantec's total revenues.

17.     Among other areas of expansion, Symantec sought to develop and acquire more products for corporate customers.  Specifically, Symantec sought to offer products that would serve enterprise environments in which desktop computers were connected with local and other networks.  Symantec was determined to achieve a goal of providing integrated, platform independent and centralized network administration solutions.  Symantec's investment and innovation led to the launching the Norton Enterprise Framework in 1996.  By the late 1990s, Symantec was marketing three major product lines. The first line covered security and assistance products, consisting mainly of Norton AntiVirus and Norton Utilities products to keep personal computers protected and reliable.  The second line included remote productivity solutions, which enabled telecommuters, mobile professionals and workers in remote offices to access information, applications and data on-demand from any location.  The third line included internet tools, primarily for Java programmers.

18.     On August 1, 2016, Symantec acquired Blue Coat Systems, Inc. ("Blue Coat"). Blue Coat was founded in 1996, and has been a leading provider of advanced web security solutions for global enterprises and governments.  Through the acquisition, Symantec expanded and complemented its technology offerings with the addition of Blue Coat's security platform technology.

19.     Symantec (including Blue Coat) has been a market leader with its technology offerings and has been dedicated to continued innovation to help customers secure and manage their information. Symantec expended tremendous resources in research and development to create the intellectual property upon which its products are based.  Over the years, Symantec has invested billions of dollars in research and development, and a significant portion of that investment is protected by a portfolio of over 2,000 United States patents.

**Zscaler's Infringing Cloud Security Platform**

20.     Zscaler is a relative newcomer to the network security arena, having been founded in 2008.  Zscaler has gained momentum in the marketplace through unlawful use of the technology claimed in the Patents-in-Suit.  Symantec is a direct competitor with Zscaler in the

1  network security space, and Zscaler's infringement of the Patents-in-Suit is causing Symantec

2  irreparable harm.

3       21.    On information and belief, Zscaler's cloud security platform, including without

4  limitation its Zscaler Enforcement Node or "ZEN" component (collectively, "the Zscaler

5  Platform"), infringes one or more of the Patents-in-Suit, as described in more detail below.

6                       **Zscaler's Infringement is Willful**

7       22.    Zscaler has been aware of the Patents-in-Suit and its infringement of those

8  patents since at least the filing of Symantec's Original Complaint in *Symantec Corp. v. Zscaler,*

9  *Inc.*, Case No. 1:17-cv-00432 (D. Del. Apr. 18, 2017) on April 18, 2017.

10      23.    Symantec's April 18, 2017 Complaint explained how Zscaler met each element

11 of a claim of each of the Patents-in-Suit.  Despite this knowledge, Zscaler has deliberately

12 chosen to continue to infringe the Patents-in-Suit by making, using, importing, selling, and/or

13 offering to sell the Zscaler Cloud Security Platform.

14      24.    In addition, on information and belief, the '429 Patent was brought to Zscaler's

15 attention at least through Zscaler's hiring of Lee Dolsen, an inventor of the '429 Patent, from

16 Blue Coat on or around May 28, 2012.  On information and belief, Lee Dolsen has a leadership

17 role as a technical director at Zscaler, and has an ownership stake in Zscaler.  On information

18 and belief, Zscaler also had knowledge of the '429 Patent through Zscaler's hiring of: (1) Adam

19 Thompson from Blue Coat on or around March 1, 2016; (2) Haggai Polak from Blue Coat on or

20 around December 23, 2015; (3) Mark Ryan from Blue Coat on or around January 8, 2011; and

21 (4) Steve House from Blue Coat on or around September 4, 2015.  Nevertheless, Zscaler has

22 continued its infringement of the '429 Patent with full knowledge of that infringement.

23      25.    On information and belief, the '446 Patent was brought to Zscaler's attention at

24 least through Zscaler's hiring of Lee Dolsen, an inventor of the '446 Patent, from Blue Coat on

25 or around May 28, 2012.  On information and belief, Lee Dolsen has a leadership role as a

26 technical director at Zscaler, and has an ownership stake in Zscaler.  On information and belief,

27 Zscaler also had knowledge of the '446 Patent through Zscaler's hiring of: (1) Adam Thompson

28 from Blue Coat on or around March 1, 2016; (2) Haggai Polak from Blue Coat on or around

BAKER BOTTS L.L.P.

December 23, 2015; (3) Mark Ryan from Blue Coat on or around January 8, 2011; and (4) Steve House from Blue Coat on or around September 4, 2015.  Nevertheless, Zscaler has continued its infringement of the '446 Patent with full knowledge of that infringement.

26.     On information and belief, Zscaler also had knowledge of the '658 Patent through Zscaler's hiring of: (1) Adam Thompson from Blue Coat on or around March 1, 2016; (2) Haggai Polak from Blue Coat (and previously Packateer) on or around December 23, 2015; (3) Mark Ryan from Blue Coat on or around January 8, 2011; (4) Steve House from Blue Coat on or around September 4, 2015; and (5) Lee Dolsen from Blue Coat on or around May 28, 2012. Nevertheless, Zscaler has continued its infringement of the '658 Patent with full knowledge of that infringement.

27.     On information and belief, Zscaler also had knowledge of the '488 Patent through Zscaler's hiring of: (1) Adam Thompson from Blue Coat on or around March 1, 2016; (2) Haggai Polak from Blue Coat on or around December 23, 2015; (3) Mark Ryan from Blue Coat on or around January 8, 2011; (4) Steve House from Blue Coat on or around September 4, 2015; and (5) Lee Dolsen from Blue Coat on or around May 28, 2012.  Nevertheless, Zscaler has continued its infringement of the '488 Patent with full knowledge of that infringement.

28.     On information and belief, Zscaler also had knowledge of the '540 Patent through Zscaler's hiring of: (1) Adam Thompson from Blue Coat on or around March 1, 2016; (2) Haggai Polak from Blue Coat on or around December 23, 2015; (3) Mark Ryan from Blue Coat on or around January 8, 2011; (4) Steve House from Blue Coat on or around September 4, 2015; and (5) Lee Dolsen from Blue Coat on or around May 28, 2012.  Nevertheless, Zscaler has continued its infringement of the '540 Patent with full knowledge of that infringement.

29.     On information and belief, Zscaler also had knowledge of the '696 Patent through Zscaler's hiring of: (1) Adam Thompson from Blue Coat on or around March 1, 2016; (2) Haggai Polak from Blue Coat on or around December 23, 2015; (3) Steve House from Blue Coat on or around September 4, 2015; and (4) Lee Dolsen from Blue Coat on or around May 28, 2012.   Nevertheless, Zscaler has continued its infringement of the '696 Patent with full knowledge of that infringement.

30.     On information and belief, Zscaler's continued infringement of the Patents-in-Suit has been willful and deliberate.  In particular, as set forth below, Zscaler has willfully infringed at least by copying features from Blue Coat's (now Symantec's) products that incorporate or reflect the asserted claims of the Patents-in-Suit, failing to conduct a post-filing investigation, failing to take any remedial actions upon learning of the patents, and increasing its acts of infringement since the filing of this case.

31.     On information and belief, Zscaler actively recruited and hired away several former employees of Blue Coat in an effort to obtain information about and copy features from Blue Coat's products.  These individuals included, among others, Adam Thompson, Haggai Polak, Lee Dolsen, Mark Ryan, and Steve House.

32.     These individuals had knowledge regarding the operation of Blue Coat's products.  For example, Mr. Thompson, Mr. Dolsen, Mr. Ryan, and Mr. House worked on Blue Coat's ProxySG product before Zscaler hired them away from Blue Coat.  While at Blue Coat, Mr. Thompson also worked on Blue Coat's Malware Analysis, Encrypted Traffic Management, SSL Visibility, Threatpulse, and Packet Shaper solutions.  On information and belief, Zscaler availed itself of Mr. Dolsen's knowledge and assistance to conduct its infringing activities.  On information and belief, Zscaler hired Mr. Dolsen, at least in part, to contribute to the development of the technology now accused of infringing at least the '429 and '446 Patents.

33.     Zscaler has also demonstrated a deliberate, bad-faith behavior evidencing a pattern of copying of Blue Coat's products.  For example, after recruiting Blue Coat employees, those individuals provided information regarding Blue Coat products.  Indeed, while at Zscaler, Mr. Ryan provided Zscaler's "tiger team" with what he characterized as a "brain dump" on Blue Coat's Cloud solution.

34.     On information and belief, one or more of Mr. Thompson, Mr. Polak, Mr. Dolsen, Mr. Ryan, Mr. House, and other former Blue Coat employees provided Zscaler with information related to Blue Coat's (now Symantec's) claimed technology and products incorporating that technology.  On information and belief, Zscaler used that information to copy

features from Blue Coat's claimed technology and products incorporating that technology into Zscaler's Cloud Security Platform.

35.     On information and belief, Zscaler copied features from Blue Coat's claimed technology and products to compete with Blue Coat and to "steal market share" from Blue Coat. On information and belief, Zscaler has continued to compete with Blue Coat (acquired by Symantec) using the features of the Zscaler Platform copied from Blue Coat's claimed technology and products.

36.     Zscaler's deliberate, bad-faith, and flagrant strategy to compete with Blue Coat by copying features from the claimed technology of the Patents-in-Suit constitutes egregious conduct.

37.     On information and belief, Zscaler has made no good faith effort to avoid infringement of the Patents-in-Suit.  In particular, on information and belief, Zscaler failed to conduct an adequate investigation into Symantec's infringement allegations, thereby evidencing Zscaler's wanton disregard of Symantec's patents.  Zscaler's conduct is particularly egregious given that the parties are competitors and Symantec's Complaint requests injunctive relief.

38.     On information and belief, Zscaler has taken no remedial actions upon learning of its infringement of the Patents-in-Suit.  More specifically, on information and belief, Zscaler has made no attempt to cease its infringing conduct or design around the Patents-in-Suit.

39.     Furthermore, Zscaler has increased its infringement of the Patents-in-Suit since the filing of this case.  For example, despite knowing of its infringement at least through Symantec's Complaint, Zscaler significantly increased the amount of potentially infringing daily transactions from thirty billion to forty billion.  This increase occurred in the July 2017 to December 2017 time period and evidences Zscaler's willful disregard of its infringement of the Patents-in-Suit.  As another example, Zscaler's revenue from the sales of the accused features of the Zscaler Platform has continued to increase since the filing of this case.

40.     Zscaler's deliberate decision to not only continue but to increase its infringement of the Patent-in-Suit since the filing of this case also constitutes egregious and wanton conduct.

BAKER BOTTS L.L.P.

41.     In view of the forgoing, Zscaler's infringement of the Patents-in-Suit has been willful, done deliberately and with full knowledge that the use of the Zscaler Cloud Security Platform infringes the Patents-in-Suit, justifying an increase in the damages to be awarded to Symantec up to three times the amount found or assessed, in accordance with 35 U.S.C. § 284.

### PATENT INFRINGEMENT CLAIMS

### Count I – Infringement of U.S. Patent No. 6,285,658

42.     Symantec incorporates by reference the allegations in Paragraphs 1 through 41 above.

43.     The '658 Patent is a continuation of U.S. Patent application No. 08/977,642, filed on November 24, 1997 (which issued as U.S. Patent No. 6,046,980), and claims priority to U.S. provisional application No. 60/032,485, filed December 9, 1996.  The sole named inventor on the '658 Patent is Robert Packer.

44.     By 1996, Robert Packer had identified a major technical problem with TCP/IP: namely, it lacks explicit supervisory function over the data transmission rate used by the various media connected to the Internet.  *See* Ex. A, '658 Patent at 1:64-2:2.  TCP/IP is a protocol that is unique to transmissions over the Internet.  TCP/IP's lack of explicit supervisory function is problematic because communications over the Internet utilize the TCP/IP protocol suite. When network resources (e.g., bandwidth) become scarce, competition between highspeed packet flows and low-speed packet flows cause congestion, which can lead to delay, packet loss, and dropped connections.  *See id.* at 1:57-2:13.  These are problems that specifically arise in computer networks.

45.     One of the major impediments to improving data communications was that TCP flow control mechanisms operated exclusively at endpoints in the network to limit the rate at which TCP endpoints emit data, and TCP lacks the ability to provide explicit data rate control. *See id.* at 2:25-27 (explaining that "there is heretofore no concept of coordination of data rates among multiple flows"). A potential solution is for TCP end systems to "back-off" (i.e., inhibit transmission) as a reaction to consecutive packet loss, which would require queuing packets and discarding packets when certain congestion thresholds are exceeded. In such an approach, the

discarded, and therefore unacknowledged, packet could serve as a feedback mechanism to the TCP transmitter. *See id.* at 2:53-58. The negative technical repercussions of such an approach, however, would be significant. For example, configuring queuing options is difficult and "[d]iscarding packets as a feedback mechanism to TCP end systems may cause large, uneven delays perceptible to interactive systems." *Id.* at 3:6-12. These are problems that specifically arise in computer networks.

46. Recognizing and solving the deficiencies associated with existing approaches to bandwidth management, Robert Packer invented methods and systems for managing network bandwidth based on information ascertainable from multiple layers of OSI network model—solutions that are particularly useful in conjunction with data flow rate detection and control of digitally-switched packet telecommunications environments normally not subject to data flow rate control (such as TCP/IP environments, which inherently lacked explicit data rate control). *See id.* at 1:57-63. These methods and systems were and are a significant improvement over (and patentably distinct from) prior approaches to bandwidth management, which were not capable of explicitly managing "TCP packet traffic based upon information about the flow's characteristics at multiple OSI protocol layers." *Id.* at 3:23-30. *See also* Ex. H, '658 Patent Prosecution History, at 221-227 (notice of allowance). Indeed, at the time of filing the '658 Patent, bandwidth management was "not known to employ information contained in the packets corresponding to higher OSI protocol layers, even though such information may be extremely useful in making bandwidth allocation and management decisions." '658 Patent at 3:31-35.

47. Specifically, the claimed invention of the '658 Patent provides a novel method for bandwidth management utilizing information obtained from the layers of a multi-layered communication protocol (e.g., TCP/IP). *See id.* at 3:38-51. For example, the '658 Patent describes various layers of the TCP/IP protocol suite, including the physical layer, data link layer, network layer, transport layer, and application layer. *Id.* at 8:7-9:59. Using information parsed from the layers, the '658 Patent explains that "explicit data rate control" can then be applied to the flow to control the assignment of available bandwidth. Managing bandwidth on

1   IP flows in this manner was neither generic nor well-known in the field at the time the '658

2   Patent was filed.

3       48.   The '658 Patent describes and claims a number of novel and inventive

4   approaches to implementing bandwidth management in computer networks.  These inventive

5   approaches are captured in independent Claims 1, 6, 7, 10, 11, and 13, and their respective

6   dependent claims.  The claimed approaches are tied to computers and cannot be performed by a

7   human alone.   Claim 1, for example, recites "[a] method for allocating bandwidth in a

8   connection-less network system having an arbitrary number of flows of packets" comprising

9   "parsing a packet into a flow specification," "matching the flow specification . . . to a plurality

10  of hierarchically-recognized classes represented by a plurality of nodes," "associating said flow

11  specification with one class," and "allocating bandwidth resources according to a policy

12  associated with said class."   Claim 6, meanwhile, recites "[i]n a packet communication

13  environment allocated into layers, including at least a transport layer, link layer, and an

14  application layer and having defined traffic classes, a method for classifying Internet Protocol

15  (IP) flows at the transport layer for use in determining a policy, or rule of assignment of a

16  service level, and enforcing that policy by direct rate control."   The method of Claim 6

17  comprises "applying individual instances of traffic classes to a classification tree for said defined

18  traffic classes based on selectable information obtained from an application layer of a

19  communication protocol," and "mapping the IP flow to the defined traffic classes, said defined

20  traffic classes having an associated policy."

21      49.   Claim 7 recites "[a] method for managing bandwidth on Internet Protocol (IP)

22  flows in a packet communication environment allocated into layers, including at least a transport

23  layer, a link layer, and an application layer" that comprises "automatically detecting selectable

24  information about each one of said flows," "determining a policy for assigning a service level to

25  said flows based upon said selectable information," and "implementing said policy by explicit

26  data rate control of said one of said flows."

27      50.   Claim 10, meanwhile, recites "[a] method for allocating network bandwidth,

28  which bandwidth comprises guaranteed information rate (GIR) resources, excess information

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

rate (EIR) resources and unreserved rate resources, on Internet Protocol (IP) flows of packets in a connection-less network service environment allocated into layers" that comprises "automatically detecting selectable information about one of said flows," "determining a policy for assigning a service level to said one of said flows based upon said automatically detected selectable information . . ., said policy directing either reserved service or unreserved service," and "dynamically allocating said bandwidth representing a combination of GIR resources, EIR resources and unreserved resources among a plurality of said flows assigned to said service level by said determining step." Although Claim 11 shares some of the limitations of Claim 10, the unique approach of Claim 11 further involves "extrapolating from input rate an extrapolated unreserved demand (EUD)" and "determining a target rate for each said input according to said priority by multiplying said extrapolated unreserved demand by said satisfaction percentage of demand determined in the allocating step."

51. Claim 13, meanwhile, recites "[a] system for allocating bandwidth in a connection-less network service environment having any number of flows of flows . . . using a classification paradigm" that comprise "a network routing device," "means for classifying a plurality of flows," means for allocating bandwidth," and "means for enforcing said bandwidth allocation."

52. These claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional. To the contrary, the specification describes that bandwidth management was "not known to employ information contained in the packets corresponding to higher OSI protocol layers" before the invention of the '658 Patent. *Id.* at 3:31-33. Thus, for example, the steps of "automatically detecting selectable information about each one of said flows," "determining a policy for assigning a service level to said flows based upon said selectable information automatically detected about one of said flows," and "implementing said policy by explicit data rate control of said one of said flows" recited in Claim 7 capture an unconventional approach to managing bandwidth on IP flows in a packet communication environment allocated into layers that was unknown in the field before the invention of the '658 Patent. These claimed concepts

1    solve the problems described above and provide the advantages and improvements to computers

2    described below.

3          53.    Notably, the claimed inventions of the '658 Patent do not foreclose alternative

4    approaches to managing bandwidth.  That the claimed inventions of the '658 Patent do not

5    foreclose alternative approaches to managing bandwidth is evidenced by the substantial number

6    of patents that have issued after the disclosure of the '658 Patent had been considered during

7    prosecution of those patents.  For example, on information and belief at least 58 U.S. Patents

8    have issued after the disclosure of the '658 Patent was considered during prosecution.  *See* Ex.

9    R.  Thus, rather than preclude all approaches to managing bandwidth, the claimed inventions of

10   the '658 Patent are novel techniques that offered significant technical advantages over prior

11   approaches, as described in more detail below.

12         54.    The inventions described and claimed in the '658 Patent improve the functioning

13   of the computer networks in which they are implemented.  For example, prior to the invention of

14   the '658 Patent, the performance of computer networks (and in particular, TCP/IP networks)

15   suffered from delay, packet loss, and dropped connections.  Whether these problems arose due

16   to an absence of supervisory control over the rate of data transport or as a result of deficiencies

17   of existing approaches, the performance of the network was negatively impacted.   The

18   inventions described and claimed in the '658 Patent solved these problems and thereby

19   improved the functioning of the networks in which they were implemented by reducing the

20   amount of delay, packet loss, and dropped connections.

21         55.    The claimed invention of the '658 Patent offered a number of additional technical

22   advantages and improvements over prior approaches.  As one example, the application of

23   explicit data rate control "optimize[s] the efficiency of data transfer while minimizing the risk of

24   data loss" in a manner that could not be achieved using the prior approaches.  *Id.* at 2:8-10.  As

25   another example, the claimed techniques allowed service levels to be defined in terms of explicit

26   rates, and the service levels could be scaled to a remote client or server's network access rate.

27   Different service levels could be specified for high speed and low speed users.  *See id.* at 4:14-

28   18.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

56. The solutions described and claimed in the '658 Patent represented a significant advance over existing approaches, and were not well-known, routine, or conventional in the field at the time the application leading to the '658 Patent was filed. On information and belief, during examination of the application which ultimately issued as the '658 Patent, the patent examiner at the United States Patent and Trademark Office ("USPTO") considered at least 12 U.S. patent documents. *See id.* at Cover Page. *See also* Ex. H, '658 Patent Prosecution History, at 107, 117, 323 (describing search results and references considered). These include references describing solutions from Microsoft, Fujitsu, and IBM, amongst others. The patent examiner determined that none disclosed or rendered obvious the inventions of the '658 Patent. *See* Ex. H, '658 Patent Prosecution History, at 221-227 (notice of allowance). Indeed, the examiner stated that "[n]o prior art of record was found for a system for managing flow bandwidth utilization at network, transport and application layers in store and forward network, as claimed, used for classifying packet network flows for use in determining a policy, or rule or assignment of a service level and enforcing that policy by rate explicit data rate control" as described and claimed in the '658 Patent. *Id.* at 222.

57. The innovative solutions described and claimed in the '658 Patent were reduced to practice in Packeteer's flagship product, Packetshaper™. Ex. A, '658 Patent at 4:59-62.[1] The rate control technology claimed by the '658 Patent and embodied in the Packetshaper™ product was widely heralded as an innovative technical solution by the network security industry. For example, Packeteer's Packetshaper™ bandwidth management solution won "CMP Media's Network Industry Award for Network Innovation Product of the Year." *See* Ex. I, Press Release, "Packeteer's Packetshaper Named 'Network Innovation Product Of The Year,'" July 9, 1999 (available at https://web.archive.org/web/20000620042708/http://www.packeteer.com:80/news/releases.cfm). The judges "honored Packeteer's PacketShaper for its innovative technology." *Id.* David Wilby, enterprise networks editor of Network Week, explained that "[w]hat managers need is

---

[1] Packeteer was acquired by Blue Coat in 2008, which itself was acquired by Symantec in 2016.

better control and utilization of the existing capacity. Using Packetshaper managers can discover network traffic patterns, set service level policies and control application performance. In this way, critical traffic can be guaranteed bandwidth, while less important usage, such as casual Web surfing, is controlled in bursts if sufficient bandwidth for both applications is unavailable." *Id.*

58.     As another example, Packeteer's Packetshaper™ product was named "Best of Show in the network security and performance category by CMP's *Data Communications* and *InternetWeek* editors." Ex. J, Press Release, "Packeteer Wins Best of Show at Network+Interop 99 Atlanta," September 16, 1999 (available at https://web.archive.org/web/20000620042708/http://www.packeteer.com:80/news/releases.cfm). The "Best of Show Product Awards Program is designed to help end-users evaluate the new product offerings" and the "editors of *Data Communications* and *InternetWeek* . . . scour the industry and show floor evaluating hundreds of new products, selecting finalists that have unique or value-added product solutions." *Id.* The editorial judging team for the Best of Show Awards picked Packeteer's Packetshaper™ because they believed "it's one of the most innovative solutions in the network security and performance category." *Id.* This industry recognition further demonstrates that the inventive approaches described and claimed in the '658 Patent represented significant advances over prior approaches that were not well-known, routine, or conventional in the field at the time the '658 Patent was filed.

59.     On information and belief, Zscaler directly infringes one or more claims of the '658 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Symantec.

60.     Claim 7 of the '658 Patent recites as follows:

>      A method for managing bandwidth on Internet Protocol (IP) flows in a packet communication environment allocated into layers, including at least a transport layer, a link layer and an application layer, said method comprising:

>           automatically detecting selectable information about each one of said flows;

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

determining a policy for assigning a service level to said flows based upon said selectable information automatically detected about one of said flows; and

implementing said policy by explicit data rate control of said one of said flows.

61.     On information and belief, the Zscaler cloud security platform satisfies each and every limitation of Claim 7. Zscaler's cloud security platform, including its ZEN component, performs a method for managing bandwidth on Internet Protocol (IP) flows in a packet communication environment allocated into layers, including at least a transport layer, a link layer and an application layer. For example, Zscaler provides bandwidth control features that allow for management of bandwidth on IP flows, such as by allocating bandwidth to certain applications or by throttling bandwidth. Zscaler performs this method in a packet communication environment by communicating packets over the Internet between an Internet host and a client. That environment includes a transport layer, a link layer, and an application layer. Zscaler's cloud security platform, including its ZEN component, automatically detects selectable information about each one of the flows by, for example, determining that a particular flow is associated with an application class or URL. Zscaler offers seven predefined classes of business applications, including general surfing, large files, sales/support applications, financial applications, media/streaming, web conferencing, and voice over IP. Zscaler's cloud security platform, including its ZEN component, determines a policy for assigning a service level to the flows based upon said selectable information automatically detected about one of the flows. For example, ZScaler's platform includes policies for certain URLs or traffic classes. Whenever the ZEN is analyzing traffic, the ZEN determines if the traffic meets any of the policy's URLs or traffic classes. When the ZEN identifies a match, the ZEN associates the URL or traffic class with the service level (e.g., guaranteeing bandwidth or throttling bandwidth) that's been assigned to that traffic class or URL. Zscaler's cloud security platform, including its ZEN component, implements the policy by explicit data rate control of said one of said flows by, for example, throttling bandwidth or guaranteeing a minimum bandwidth.

62.     In view of the foregoing, Zscaler directly infringes the '658 Patent in violation of 35 U.S.C. § 271(a).

63.     On information and belief, both by configuring the ZEN component to operate in a manner that Zscaler knows infringes the '658 Patent and by encouraging customers to use the ZEN component in a manner that Zscaler knows infringes the '658 Patent, Zscaler is inducing infringement of the '658 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of service of this complaint.  For example, Zscaler's marketing literature touts functionality of the ZEN component that falls within the scope of the above-identified claims of the '658 Patent.

64.     Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and continues to suffer damages and irreparable harm.  Unless Zscaler's acts of infringement are enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

## Count II – Infringement of U.S. Patent No. 7,360,249

65.     Symantec incorporates by reference the allegations in Paragraphs 1 through 64 above.

66.     Since their inception, computer systems have faced threats from attack by malicious computer code, such as worms, viruses, and Trojan horses.  Ex. B, '249 Patent at 1:12-13.  Malicious code of this nature can infect a computer in a variety of ways (e.g., by a user introducing an infected disk or other medium into a computer or from files transmitted to a network computer, such as an executable program included in an email attachment).  At the time of the filing of the '249 Patent, existing approaches to network security suffered from deficiencies that exposed computers to attacks by malicious code.  These are problems that specifically arise in computer networks.

67.     For example, existing antivirus scanning software could "only detect the presence of malicious code for which a known signature is available" and would "generally fail to detect new malicious code until an updated signature for the malicious code is available." *Id.* at 1:35-39.  Malicious code, however, can do "an enormous amount of damage to computer systems" in even a small amount of time before an updated signature is received. *Id.* at 1:39-41.  Behavioral

BAKER BOTTS L.L.P.

blocking software was similarly deficient "because behavior blocking software only detects a threat once the malicious code is being executed on a system, the malicious code often has a chance to do damage before detection." *Id.* at 2:2-5. A computer system may be attacked by the same threat multiple times, and "each time the malicious code is executed, the computer system is at risk of an attack that the behavior blocking software might not timely recognize." *Id.* at 2:6-16.

68.    Even in combination, the use of antivirus scanning software and behavioral blocking software did not offer the level of protection needed to adequately protect computer systems from the threats posed by malicious code. At the first line of defense, "antivirus scanning software might fail to detect the new malicious code each time it is executed because there is no known signature for the code." *Id.* at 2:28-30. In such a scenario, a user may be forced to rely on the behavior blocking software to detect and block attempted malicious behavior as early as possible. By the time behavior blocking software detects that malicious code is running on the system, however, it is possible that the malicious code has already caused damage to the computer system. *See id.* at 2:30-33.

69.    By January 13, 2004 (the date the application from which the '249 Patent issued was filed), the inventors of the '249 Patent had identified "a need to recognize and remember new malicious code the first time it is executed, so that subsequent execution of the code can be prevented." *Id.* at 2:33-35. The inventors of the '249 Patent invented novel methods, systems, and computer readable media for solving these problems and preventing the propagation of malicious code on a computer system. *Id.* at 2:39-41. In a significant improvement over prior approaches to network security, the invention described and claimed in the '249 Patent "connect[s] the antivirus-scanning event to the behavior-blocking event so that a signature of new malicious code can be generated in response to a blocking event and used to identify the same or similar malicious code in the future." *Id.* at 6:26-31. With the inventive solution described in the '249 Patent, a user "might execute an e-mail attachment containing malicious code. When the user opens the attachment, the code . . . runs and is detected and blocked by the blocking-scanning manager," and a signature can be generated. *Id.* at 6:3-7. The signature

BAKER BOTTS L.L.P.

generated can be stored in a file (e.g., locally, on a remote server, or elsewhere) where it can be later accessed for identification of potential malicious code. *See id.* at 5:31-36.  For example, "[t]he email attachment might then appear a second time, or any number of times, in the user's . . . e-mail box and the user might attempt to execute it any number of times.  In these subsequent executions or attempted executions, however, the identified code . . . can be recognized by the blocking-scanning manager," which "compares the identified code to the signature that was previously generated to identify the code," enabling it to be "blocked before it is even executed this time." *Id.* at 6:8-16.  For example, a scanning module of the blocking-scanning manager can "use the signatures generated by the blocking scanning manager" to determine if new malicious code, which has so far only been identified by the blocking-scanning manager," is present.  *Id.* at 6:22-26.  This improves the functioning of the network security system by advantageously enabling "code for which a signature has been generated by the blocking-scanning manager" to be "blocked before the code is even executed and has the opportunity to damage the computer." *Id.* at 6:43-49.

70.     This inventive approach of connecting the antivirus scanning event to the behavior-blocking event so that a signature of new malicious code can be generated in response to a blocking event and used to identify the same or similar malicious code in the future was a significant improvement over (and patentably distinct from) existing approaches to protecting against malicious code.  *See* Ex. K, '249 Patent Prosecution History, at 110-117.  The inventive approach described in the specification is captured in at least independent Claims 1, 10, 12, 16, and 20, and their respective dependent claims.  The claimed approaches are tied to computers and cannot be performed by a human alone.  For example, Claim 12 recites in part "a blocking-scanning manager detecting attempted malicious behavior of running code," "responsive to the detection, the blocking-scanning manager blocking the attempted malicious behavior," "the blocking-scanning manager generating a signature to identify the code that attempted the malicious behavior," "the blocking scanning manager detecting code identified by the signature," and "the blocking-scanning manager blocking the execution of the identified code."  Each of Claims 1, 10, 16, and 20 recites analogous features.

BAKER BOTTS L.L.P.

71.     In addition to connecting the antivirus scanning event and the behavior-blocking event to enable identification of the same or similar malicious code in the future, the '249 Patent describes and claims other novel and inventive techniques that distinguish it from prior approaches to network security.  For example, the '249 Patent describes that the blocking-scanning module can be configured to regulate the number of signatures that are generated and/or stored in order to advantageously prevent an excessive number of signatures passing over a network at once, which might otherwise slow down the network activity.  Ex. B, '249 Patent at 10:13-23.  This inventive approach is captured in at least Claim 10 and its respective dependent claims.  For example, Claim 10 recites in part "the blocking-scanning manager regulating the number of signatures generated within a period of time, wherein regulating the number of signatures comprises: the blocking scanning manager recognizing a predetermined limit on the number of signatures generated within a period of time; and responsive to reaching the predetermined limit, the blocking-scanning manager removing older signatures as newer signatures are generated."

72.     As another example, the '249 Patent describes that an alert module may be used to alert a user when malicious behavior is detected and allow the user to choose how to proceed (e.g., whether to block or allow the behavior of the running code).  *See id.* at 4:35-40.  The '249 Patent describes that the alert module may be configured to override the user's choice in some instances, such as where the user incorrectly chooses to block non-malicious behavior or not to block malicious behavior.  *See id.* at 4:41-46.  This advantageously prevents a situation where the user has "accidentally chosen to permanently block a non-malicious program that should have been permitted to run" and provides a safeguard against a user's "misjudgment in allowing malicious code to be executed."  *Id.* at 4:46-51.  This inventive approach of the '249 Patent is captured in at least Claims 1, 16, and 20, together with their respective dependent claims.  For example, Claim 1 recites "the blocking-scanning manager detecting code identified by the signature, wherein detecting code identified by the signature comprises the blocking-scanning manager alerting a user of the detection; and the blocking-scanning manager allowing the user to choose whether or not to block the execution of the identified code" and "the blocking-scanning

BAKER BOTTS L.L.P.

1   manager overriding the user's choice responsive to the user incorrectly choosing to block non-

2   malicious behavior or incorrectly choosing not to block malicious behavior."

3        73.    These claim elements, individually or in combination, are unconventional, and

4   nothing in the specification describes these concepts as well-understood, routine, or

5   conventional.  To the contrary, the '249 Patent describes that "antivirus scanning software might

6   fail to detect the new malicious code each time it is executed because there is no known

7   signature for the code" (*Id.* at 2:28-30) and by the time behavior blocking software detects that

8   malicious code is running on the system, it was possible that the malicious code has already

9   caused damage to the computer system.  *See id.* at 2:30-33.  Thus, for example, the steps of "a

10  blocking-scanning manager detecting attempted malicious behavior of running code,"

11  "responsive to the detection, the blocking-scanning manager blocking the attempted malicious

12  behavior," "the blocking-scanning manager generating a signature to identify the code that

13  attempted the malicious behavior," "the blocking scanning manager detecting code identified by

14  the signature," and "the blocking-scanning manager blocking the execution of the identified

15  code" capture an unconventional approach to network security that enables recognizing and

16  remembering new malicious code the first time it is executed, so that subsequent execution of

17  the code can be prevented.  These claimed concepts solve the problems described above and

18  provide the advantages and improvements to computers described below.

19       74.    Notably, the claimed inventions of the '249 Patent do not foreclose alternative

20  approaches to preventing malicious code from propagating in a computer.  That the claimed

21  inventions of the '249 Patent do not foreclose alternative approaches to preventing malicious

22  code from propagating in a computer is evidenced by the substantial number of patents that have

23  issued after the disclosure of the '249 patent had been considered during prosecution of those

24  patents.  For example, on information and belief at least 16 U.S. Patents have issued after the

25  disclosure of the '249 Patent was considered during prosecution.  *See* Ex. S.  Thus, rather than

26  preclude all approaches to blocking of malicious code, the claimed inventions of the '249 Patent

27  are novel techniques that offered significant technical advantages over prior approaches, as

28  described in more detail below.

BAKER BOTTS L.L.P.

75.     The inventions described and claimed in the '249 Patent improve the functioning of the computer systems in which they are implemented.  For example, prior to the invention of the '249 Patent, the performance of computer systems often suffered due to the failure to detect malicious code, leading to system instability, malfunction, and/or loss of critical files.  For example, the damage caused by undetected viruses can range from mildly annoying effects to damage to hardware, software, or files.  As another example, a worm introduced into a computer system can consume too much system memory (or network bandwidth), causing Web servers, network servers and individual computers to stop responding.  As another example, computer systems that have been compromised by a Trojan horse may allow malicious users and/or programs access to the computer system to steal confidential and personal information.  The inventions described and claimed in the '249 Patent solved these problems by preventing malicious code from propagating in a computer and enabling malicious code to be recognized and remembered the first time it is executed so that subsequent execution of the code can be prevented, thereby reducing or eliminating the above-described consequences that can result from malicious code.

76.     Moreover, the inventions described and claimed in the '249 Patent improved the functioning of antivirus scanning software and behavioral blocking software and offered technical advantages over existing approaches.  For example, the claimed inventions of the '249 Patent connect "the antivirus scanning event to the behavior-blocking event so that a signature of new malicious code can be generated in response to a blocking event and used to identify the same or similar malicious code in the future."  *Id.* at 6:26-31.  This was a marked improvement over existing approaches that were unable to connect an antivirus scanning event to the behavior blocking event, which exposed computer systems to threats due to repeated execution of potentially malicious code.  As another example, the claimed inventions of the '249 Patent enabled a user's decision regarding whether to block malicious code to be overridden, improving the overall security of the computer system and preventing actions that may result in damage to the computer system (e.g., avoiding situations where malicious code is permitted to execute).  As another example, the claimed inventions of the '249 Patent increased the speed of

BAKER BOTTS L.L.P.

the network by allowing the number of signatures that are generated and/or stored to be regulated, thereby preventing an excessive number of signatures passing over the network at once and slowing down the network activity.

77.     The inventions described and claimed in the '249 Patent represented a significant advance over existing approaches to network security that were not well-known, routine, or conventional in the field at the time the '249 Patent was filed.  Indeed, during examination of the application which ultimately issued as the '249 Patent, the patent examiner at the USPTO considered a number of references, including references describing solutions from IBM, amongst others, and determined that none disclosed or rendered obvious the inventions of the '249 Patent.  *See id.* at Cover Page.  *See also* Ex. K, '249 Patent Prosecution History, at 65-66, 90, 93 and 108-109 (describing search results and references considered); 110-117 (notice of allowance).  Indeed, the examiner stated that the prior art of record "fails to teach alone, or in combination, other than via hindsight, at the time of the invention" the claimed features.  *See id.* at 114.

78.     On information and belief, Zscaler directly infringes one or more claims of the '249 Patent, either literally or under the doctrine of equivalents.  Non-limiting examples of such infringement are provided below, based on the limited information currently available to Symantec.

79.     Claim 12 of the '249 Patent recites as follows:

A computer implemented method for preventing malicious code from propagating in a computer, the method comprising the steps of:

a blocking-scanning manager detecting attempted malicious behavior of running code;

responsive to the detection, the blocking-scanning manager blocking the attempted malicious behavior;

the blocking-scanning manager generating a signature to identify the code that attempted the malicious behavior, wherein generating a signature to identify the code that attempted the malicious behavior comprises:

the blocking-scanning manager applying a hash function to generate a hash of the code that attempted the malicious behavior;

BAKER BOTTS L.L.P.

1

the blocking-scanning manager storing the hash; and

2

the blocking-scanning manager using at least one stored hash to identify code that attempted malicious behavior;

3

4

the blocking-scanning manager detecting code identified by the signature; and

5

the blocking-scanning manager blocking the execution of the identified code.

6

7

80.     On information and belief, the Zscaler cloud security platform satisfies each and every limitation of Claim 12.  Zscaler's cloud security platform, including its ZEN component and its Behavior Analysis functionality prevents malicious code from propagating in a computer, as described below.  Zscaler's cloud security platform, including its ZEN component, includes a blocking-scanning manager detecting attempted malicious behavior of running code.  For example, Zscaler's Behavior Analysis functionality executes suspicious files in a sandbox, analyzes them for malicious behavior, and detects malware files.  Zscaler's cloud security platform, including its ZEN component, includes:  responsive to the detection, the blocking-scanning manager blocking the attempted malicious behavior.  For example, Zscaler's Behavior Analysis functionality automatically blocks malware files; further, some files are quarantined until the behavioral analysis is complete and then blocked after quarantining.  Zscaler's cloud security platform, including its ZEN component, includes the blocking-scanning manager.  The blocking-scanning manager generates a signature to identify the code that attempted the malicious behavior.  The generation of a signature to identify the code that attempted the malicious behavior includes the blocking-scanning manager applying a hash function to generate a hash of the code that attempted the malicious behavior and the blocking-scanning manager storing the hash.  For example, the Zscaler platform runs and analyzes files in a virtual environment to detect malicious behavior and propagates a hash of malicious files to Zscaler ZENs to maintain a blacklist against downloading malicious files.  Zscaler's cloud security platform, including its ZEN component, includes the blocking-scanning manager using at least one stored hash to identify code that attempted malicious behavior, the blocking-scanning

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER BOTTS L.L.P.

Plaintiffs' First Amended Complaint for Patent Infringement - 3:17-cv-04414-JST

BAKER BOTTS L.L.P.

manager detecting code identified by the signature, and the blocking-scanning manager blocking the execution of the identified code.  For example, Zscaler's platform, including its ZEN component, allegedly effectively maintains a real time blacklist so it can prevent users anywhere in the world from downloading malicious files.

81.     In view of the foregoing, Zscaler directly infringes the '249 Patent in violation of 35 U.S.C. § 271(a).

82.     On information and belief, both by configuring the ZEN component to operate in a manner that Zscaler knows infringes the '249 Patent and by encouraging customers to use the ZEN component in a manner that Zscaler knows infringes the '249 Patent, Zscaler is inducing infringement of the '249 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of service of this complaint.  For example, Zscaler's marketing literature touts functionality of the ZEN component that falls within the scope of the above-identified claims of the '249 Patent.

83.     Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and continues to suffer damages and irreparable harm.  Unless Zscaler's acts of infringement are enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

### Count III – Infringement of U.S. Patent No. 7,587,488

84.     Symantec incorporates by reference the allegations in Paragraphs 1 through 83 above.

85.     The '488 Patent issued from U.S. Patent Application No. 10/940,701 filed September 14, 2004, and claims priority to U.S. provisional application No. 60/503,140, filed September 15, 2003.

86.     Since the introduction of the Internet into the corporate environment, organizations have faced many challenges created by allowing employees access to the Internet. Developed as a communications and research tool, the Internet quickly became an entertainment medium and a security risk.  New content, such as Web sites and Web pages, is added on a daily basis.  *See* Ex. C, '488 Patent at 1:19-30.  There is, however, limited editorial control over what is published on the Internet, and "[t]he ready availability of questionable and potentially illegal

material has also created various problems in corporate and home environments." *Id.* at 1:31-32, 1:41-43.  These problems include, for example, employees accessing inappropriate material (e.g., pornography) using the Internet in the workplace (potentially subjecting an employer to liability) and an inability to control the content in web-page documents accessible by children in the home.  *See id.* at 1:43-53.

87.    Web filtering software is used to screen and exclude end user access to Web pages that are deemed objectionable or not business related.  Web filtering solutions are used by organizations to monitor, report and enforce pre-determined organizational Web access and usage policies.  Prior to the invention of the '488 Patent, existing approaches relied on "constant updating of a database on the client to maintain a list of content categories and, for example, approved and non-approved sites," and the use of an out-of-date database resulted in gaps in protection that only increased exposure to threats and potential liability.  *Id.* at 2:18-22. Moreover, prior approaches also risked being disabled by tech savvy employees or children.  *Id.* at 2:22-26.

88.    Additionally, administrators had to deal with the burden associated with erroneously categorized Web sites.  The end user who felt a site was wrongly categorized would submit a request to the administrator to verify the site's categorization.  There was also the reality of these servers needing regular maintenance or rebooting, which caused a loss of protection that placed the organization at risk.

89.    Along with increased management burden and cost, prior approaches did not scale in distributed organizations unless all Internet traffic was forced from the remote sites to the central site and out to the Internet through the Internet gateway.  This approach was impractical for remote offices and mobile users, and the product cost turned out to be much more than just the software—there was the higher cost associated with the daily management burden, as well as the inefficient spoke-and-hub topology that was required for organization-wide Web filtering.

90.    Moreover, Web site operators were aware of the filtering mechanisms and took steps to attempt to counter them.  As one example, Web site operators frequently changed

BAKER BOTTS L.L.P.

URLs, IP addresses, or domain names, or included content from other categories in their Web-based content.  Thus, Web sites that did not want to be blocked, like pornography and gambling Web sites, were constantly varying their configuration to circumvent filtering systems and filtering companies.  This added a new level of difficulty to the filtering process, since rules that were currently valid for blocking Web sites might not be valid in the future.  *See id.* at 2:5-16.  Prior approaches lacked the capability to handle new sites or new web-page documents that were added to the Internet between database updates.  *See id.* at 2:24-26.  This was because the use of a database alone was not enough to catch new and uncategorized Web content, which is constantly being added to the Web.  Early attempts to implement automated and/or server-based approaches faced similar problems due to the "ever-increasing and ever changing Web-based content."  *Id.* at 2:27-32.  The resulting gap in protection increased the network operators' exposure to threats and potential liability (e.g., due to employees accessing inappropriate material in the workplace).  The above-described problems are problems that specifically arise in computer networks.

91.  By September 15, 2003 (the filing date of the provisional application to which the '488 Patent claims priority), the inventors of the '488 Patent (employees of Cerberian, Inc., which was subsequently acquired by Blue Coat in 2004) had developed novel and innovative techniques that improved upon, and solved problems inherent in, prior approaches.  As described above, prior to the inventions described and claimed in the '488 Patent, existing approaches (i) lacked the capability to handle new sites or new web-page documents that were added to the Internet between database updates; and (ii) did not scale in distributed organizations.  The inventions described and claimed in the '488 Patent improved upon existing approaches by "dynamically generating Internet-content ratings" for unrated Internet-content identifiers using "a distributed architecture, which allows for scalability of the entire system by allowing multiple content-rating machines to be connected simultaneously to the system" and "facilitates dispatching unrated Internet-content identifiers to resources that can rate" them.  *See id.* at 1:15-16, 2:33-36, 3:20-23, 6:66-7:1.  These advances were significant improvements over

(and patentably distinct from) prior approaches to Web filtering.  *See* Ex. L, '488 Patent Prosecution History, at 171-178 (notice of allowance).

92.     For example, the '488 Patent describes that when "an unrated URL and content rater are available, [a] URL dispatcher . . . can dispatch the available unrated URL . . . to the available content rater for subsequent rating."  Ex. C, '488 Patent at 5:1-4.  Each content rater "can utilize a distributed plurality of classifiers . . . configured to rate content based on different criteria and/or algorithms," such as a "dynamic real time rater" that "can rate content . . . by examining the characteristics of the content," an "outbound link classifier" that "can rate content . . . based on the ratings of outbound links contained in the identified content (e.g., embedded URLs) that identify other content," and an "inbound link classifier" that "can rate content . . . based on the ratings of outbound links from other content to the content identified by the URL." *Id.* at 6:36-39, 6:59-60, 7:6-9, 7:19-21.  To dynamically determine the content category rating, the ratings from the different classifiers are dynamically combined.  Thus, "Web site content can be analyzed using a variety of different mechanisms (instead of a single rating source) that are combined in to a single, potentially much more accurate, rating." *Id.* at 6:39-42.

93.     Thus, a filtering system employing the claimed inventions of the '488 Patent can provide "up-to-date ratings for newly discovered, or recently relocated, Internet content" and, once rated, the new ratings can be "pushed to a rated database table and then pushed out to filtering service points accessible to customers." *Id.* at 9:24-25, 9:30-32.

94.     The inventive approaches described and claimed in the '488 Patent are captured in Claims 1 and 12 of the '488 Patent, and their respective dependent claims.  The claimed approaches are tied to computers and cannot be performed by a human alone.  Claim 1, for example, recites "[a]t a computer system, a method for dispatching an Internet-content identifier to a content-rating system" that comprises "receiving an indication that at least one unrated Internet-content identifier is available to be rated," "receiving an indication that one or more computerized content raters are available for rating the at least one unrated Internet-content identifier, wherein the computerized content raters include a plurality of content classifiers configured to rate content based on respective criteria," "selecting an Internet-content identifier

from among the at least one unrated Internet-content identifier based on content-identifier selection criteria," "selecting one computerized content rater from among the one or more available computerized content raters to rate the selected unrated Internet-content identifier," "transferring the selected Internet-content identifier to the selected available computerized content rater, wherein the selected Internet-content identifier identifies a portion of content," and "dynamically determining a content category rating for the selected Internet-content identifier, wherein determining a content category rating comprises dynamically combining a rating for the selected Internet-content identifier with at least one of a rating for an Internet-content identifier identified within the portion of content for the selected Internet-content identifier and an Internet-content identifier for a portion of content that identifies the selected Internet-content identifier."

95.    These claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional.  To the contrary, the specification describes that prior approaches to Web filtering (including both client-side and server-based approaches) had "no provision for new sites or new web-page documents that are added to the Internet between database updates."  *Id.* at 2:24-26.  Thus, for example, the steps of "selecting one computerized content rater from among the one or more available computerized content raters to rate the selected unrated Internet-content identifier," "transferring the selected Internet-content identifier to the selected available computerized content rater," and "dynamically determining a content category rating for the selected Internet-content identifier, wherein determining a content category rating comprises dynamically combining a rating for the selected Internet-content identifier with at least one of a rating for an Internet-content identifier identified within the portion of content for the selected Internet-content identifier and an Internet-content identifier for a portion of content that identifies the selected Internet-content identifier" as recited in Claim 1 capture an unconventional approach to Web filtering that "allows for scalability of the entire system by allowing multiple content-rating machines to be connected simultaneously to the system" (*Id.* at 4:30-36) and allows for Web site content to be "analyzed using a variety of different

BAKER BOTTS L.L.P.

1   mechanisms (instead of a single rating source) that are combined in to a single, potentially much

2   more accurate, rating" that was unknown in the field before the invention of the '488 Patent. *Id.*

3   at 6:39-42.   These claimed concepts solve the problems described above and provide the

4   advantages and improvements to computers described below.

5        96.     Notably, the claimed inventions of the '488 Patent do not foreclose alternative

6   approaches to Web filtering.   That the claimed inventions of the '488 Patent do not foreclose

7   alternative approaches to managing bandwidth is evidenced by the substantial number of patents

8   that have issued after the disclosure of the '488 Patent had been considered during prosecution

9   of those patents.   For example, on information and belief at least 14 U.S. Patents have issued

10  after the disclosure of the '488 Patent was considered during prosecution. *See* Ex. T.   Thus,

11  rather than preclude all approaches to Web filtering, the claimed inventions of the '488 Patent

12  are novel techniques that offered significant technical advantages over prior approaches, as

13  described in more detail below.

14       97.     The inventions described and claimed in the '488 Patent improved the

15  functioning of the web filtering systems in which they are implemented.   For example, prior to

16  the invention of the '488 Patent, existing Web filtering systems did not scale well in distributed

17  organizations and lacked the capability to handle new sites or new web-page documents that

18  were added to the Internet between database updates. *See id.* at 2:24-26.   This was because the

19  use of a database alone was not enough to catch new and uncategorized Web content, which is

20  constantly being added to the Web.   The inventions described and claimed in the '488 Patent

21  solved these problems by providing a method for dispatching an Internet-content identifier to a

22  content-rating system and dynamically determining a content category rating, thereby improving

23  the functioning of Web filtering systems.

24       98.     In addition to improving the functionality of Web filtering systems as described

25  above, the claimed inventions of the '488 Patent offered a number of other technical advantages

26  over prior approaches.   As one example, the claimed method for dispatching an Internet-content

27  identifier to a content rating system eliminates the cost and burden that prior filtering solutions

28  place on an organization's IT department.   The claimed invention "allows for scalability of the

BAKER BOTTS L.L.P.

entire system by allowing multiple content-rating machines to be connected simultaneously to the system" (*id.* at 4:33-36) and advantageously enables load balancing and redundancy in the system in order to meet the growth and demands of businesses.  Indeed, the patent describes that "[i]t would be apparent to one [of] skill in the art, after having reviewed this description, that this distributed system at least in part facilitates the scalability of the content rater modules 103. Accordingly, the number of content raters can be efficiently adjusted (increased or decreased) based on demands for assigning content ratings.  Content raters included in content raters 103 can be implemented as a single process thread and can be implemented at the same computer system or distributed across a plurality of different computer systems." *Id.* at 5:9-18.

99.     As another example, unlike prior systems, the claimed method permits requested Web pages to be analyzed in real-time, blocking new unrated content on-the-fly.  The use of these dynamically defined content ratings permits a higher level of protection to be provided and avoids the risks inherent in relying solely on a potentially out-of-date URL database.  For example, phishing sites are generally short-lived and each day hundreds of new ones appear, so the practice of evaluating a requested page against a static database is generally ineffective.  This problem is ameliorated by the inventions of the '488 Patent, which provides for dynamically determining a content category rating.

100.     As another example, the use of a distributed plurality of classifiers, each of which may be configured to rate content based on different criteria and/or algorithms, permits Web site content to be analyzed using a variety of different mechanisms (instead of a single rating source) that are combined into a single, potentially much more accurate, rating.

101.     Additionally, storing the dynamically determined content ratings (e.g., in a database) as recited in Claim 11 facilitates building a relevant ratings database (i.e., one built based upon the actual Internet activity and surfing habits of its users).  Indeed, the '488 Patent describes that other computer systems can "access ratings for submitted URLs.  Accordingly, these other computer systems may be relieved from having to maintain content filtering software." *Id.* at 6:30-33.

BAKER BOTTS L.L.P.

102.    The inventive approaches described and claimed in the '488 Patent represented a significant advance over prior approaches that were not well-known, routine, or conventional in the field at the time the '488 Patent was filed.  On information and belief, during examination of the application which ultimately issued as the '488 Patent, the patent examiner at the USPTO considered at least 10 U.S. patent documents.  *See id.* at Cover Page.  *See also* Ex. L, '488 Patent Prosecution History, at 102, 105, 111, 114-119, 141-148, 151, 179-279   (describing search results and references considered).  These include references describing solutions from IBM and Websense, Inc., amongst others.  The patent examiner determined that none disclosed or rendered obvious the inventions of the '488 Patent.  *See* Ex. L, '488 Patent Prosecution History, at 171-178 (notice of allowance).

103.    The innovative solutions described and claimed in the '488 Patent were also recognized by the network security industry.  On information and belief, the technical improvements disclosed by the '488 Patent were incorporated, embodied, and/or reflected in Blue Coat's Web Filter, which runs on Blue Coat's ProxySG appliances.  *See* Ex. M, "Blue Coat WebFilter Wins Computerworld Singapore Readers' Choice Award 2007," February 14, 2008 (available    at    https://news.thomasnet.com/fullstory/blue-coat-webfilter-wins-computerworld-singapore-readers-choice-award-2007-811913).    Blue Coat's WebFilter was awarded the Computerworld Singapore Readers' Choice Award 2007.  The ComputerWorld Readers' Choice Awards are considered "the Oscars of the IT industry."  *Id.*  The award recognized Blue Coat's WebFilter's "Dynamic Real-Time Rating (DRTR) for new and previously undiscovered phishing or inappropriate content sites."  *Id.*  In particular, the "Blue Coat WebFilter [was] the first Web content filter to feature Real-Time Anti-Phishing protection.  Most of the industry's available anti-phishing solutions provide protection solely by checking a user's Web URL requests against a database of known phishing sites.  Phishing sites, however, are generally short lived and each day hundreds of new ones appear, so the practice of evaluating a requested page against a static database is generally ineffective.  Rather than solely depending on a database, the Blue Coat Real-Time Anti-Phishing protection technology is the first to assess a Web site 'on the fly' and to examine the site based on proprietary algorithms.  Similarly, DRTR reviews URL

requests for new or previously undiscovered Web sites made by users of the WebFilter product. These URLs are analyzed in real time and categorized as pornography, gambling, spyware sources or some other possibly dangerous or inappropriate Website." *Id.* This industry recognition further demonstrates that the inventive approaches described and claimed in the '488 Patent represented significant advances over prior approaches that were not well-known, routine, or conventional in the field at the time the '488 Patent was filed.

104. On information and belief, Zscaler directly infringes one or more claims of the '488 Patent, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Symantec.

105. Claim 1 of the '488 Patent recites as follows:

At a computer system, a method for dispatching an Internet-content identifier to a content-rating system, the method comprising:

receiving an indication that at least one unrated Internet-content identifier is available to be rated;

receiving an indication that one or more computerized content raters are available for rating the at least one unrated Internet-content identifier, wherein the computerized content raters include a plurality of content classifiers configured to rate content based on respective criteria;

selecting an Internet-content identifier from among the at least one unrated Internet-content identifier based on content-identifier selection criteria;

selecting one computerized content rater from among the one or more available computerized content raters to rate the selected unrated Internet-content identifier;

transferring the selected Internet-content identifier to the selected available computerized content rater, wherein the selected Internet-content identifier identifies a portion of content; and

dynamically determining a content category rating for the selected Internet-content identifier, wherein determining a content category rating comprises dynamically combining a rating for the selected Internet-content identifier with at least one of a rating for an Internet-content identifier identified within the portion of content for the selected Internet-content identifier and an Internet-content identifier for a portion of content that identifies the selected Internet-content identifier.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

106.    On information and belief, the Zscaler cloud security platform satisfies each and every limitation of Claim 1.  Zscaler's cloud security platform, including its ZEN component, dispatches an Internet-content identifier to a content-rating system.  For example, the Page Risk Index feature of Zscaler's cloud security platform rates a URL, as described below.  Zscaler's cloud security platform, including its ZEN component, receives an indication that at least one unrated Internet-content identifier is available to be rated.  For example, the Page Risk Index feature of Zscaler's cloud security platform receives a new request to rate a URL.  Zscaler's cloud security platform, including its ZEN component, receives an indication that one or more computerized content raters are available for rating the at least one unrated Internet-content identifier, wherein the computerized content raters include a plurality of content classifiers configured to rate content based on respective criteria.  For example, the Page Risk Index feature uses Content Analysis and Domain Analysis control categories, each with various risk categories, and the Page Risk Index feature is calculated for each and every web request.  Zscaler's cloud security platform, including its ZEN component, selects an Internet-content identifier from among the at least one unrated Internet-content identifiers based on content-identifier selection criteria.  For example, Zscaler's cloud security platform, including its ZEN component, scans every web request and selects a URL to rate.  Zscaler's cloud security platform selects one computerized content rater from among the one or more available computerized content raters to rate the selected unrated Internet-content identifier.  For example, Zscaler's cloud security platform routes traffic to a particular ZEN component running the Page Risk Index feature.  Zscaler's cloud security platform transfers the selected Internet-content identifier to the selected available computerized content rater, wherein the selected Internet-content identifier identifies a portion of content.  For example, Zscaler's cloud security platform, including its ZEN component, calculates a page risk index for each and every web request.  The URL is transferred to the selected available computerized content rater when the request is made and/or the page risk index calculated, and the URL identifies a portion of content.  Zscaler's cloud security platform, including its ZEN component, dynamically determines a content category rating for the selected Internet-content identifier, wherein determining a content

category rating comprises dynamically combining a rating for the selected Internet-content identifier with at least one of a rating for an Internet-content identifier identified within the portion of content for the selected Internet-content identifier and an Internet-content identifier for a portion of content that identifies the selected Internet-content identifier.  For example, Zscaler's cloud security platform, including its ZEN component, dynamically determines a page risk index for a particular web request (URL).  The determined page risk index is based on a weighting of a variety of risk indicators, including injected content where page content is inspected to identify code injected into a web page, designed to directly initiate a browser attack or redirect the browser to an alternate page hosting malicious content.

107.    In view of the foregoing, Zscaler directly infringes the '488 Patent in violation of 35 U.S.C. § 271(a).

108.    On information and belief, both by configuring the ZEN component to operate in a manner that Zscaler knows infringes the '488 Patent and by encouraging customers to use the ZEN component in a manner that Zscaler knows infringes the '488 Patent, Zscaler is inducing infringement of the '488 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of service of this complaint.  For example, Zscaler's marketing literature touts functionality of the ZEN component that falls within the scope of the above-identified claims of the '488 Patent.

109.    Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and continues to suffer damages and irreparable harm.  Unless Zscaler's acts of infringement are enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

**Count IV – Infringement of U.S. Patent No. 8,316,429**

110.    Symantec incorporates by reference the allegations in Paragraphs 1 through 109 above.

111.    Prior approaches to network security suffered were deficient when it came to implementing policies to determine which traffic can pass between two networks, such as between a private network and the internet, especially when it comes to secure communications over the Internet.  For example, with many Web sites, "the information exchanged between the

BAKER BOTTS L.L.P.

Internet host(s) and the private network client is passed unencrypted.  Hence, the proxy is able to examine the information being passed and evaluate it against its firewall rules to determine whether or not the communications should be allowed." Ex. D, '429 Patent at 1:28-33.  But this is not always the case.  In some cases, "communications between the private network client and the Internet host(s) are encrypted so as to prevent eavesdropping by third parties," such as for communications between a client and hosts involved with electronic commerce or banking.  *Id.* at 1:34-40.

112.   One example of such a secure communication technique is the SSL protocol. SSL is a protocol unique to secure communications over the Internet.  It "provides privacy between two communicating applications," such as a client's Web browser and a Web server, by encrypting data exchanged between the client and the server.  *Id.* at 4:20-23, 4:31-37.  Although encryption offers many benefits (e.g., privacy), it created problems for proxy servers.  In particular, one "unfortunate consequence" was that proxy servers were not able to read the messages being passed and therefore had "no way of determining whether their firewall policies are being violated."  *Id.* at 1:41-45.  As a result, proxy servers were "vulnerable to attacks by computer viruses and other malware," and private network owners/operators were exposed to potential liability due to the possibility of permitting traffic to pass that otherwise would not have been allowed had the proxy been able to apply its policies.  *Id.* at 1:45-50.  These are problems that specifically arise in computer networks, and in particular in the context of secure communications over the Internet through proxy servers.

113.   Prior approaches to providing security in computer networks did not address this unique problem of secure communications over the Internet.  A potential solution is to "permit the proxy to decrypt all transmissions between the private network client and the host and subject those decrypted communications to scrutiny according to the firewall policies" as if the original communications had not been encrypted.  *Id.* at 1:51-55.  Such an approach, however, is unworkable for at least three reasons.  First, it defeats the purpose of providing a secure communication mechanism for sensitive data.  *See id.* at 1:56-58.  Second, the decrypted data at the proxy becomes an attractive target for attacks by third parties that desired to exploit that

1    information.  *See id.* at 1:58-60.  Third, users are likely to reject such a solution due to the

2    inevitable intrusion into a user's privacy.  *See id.* at 1:60-2:3.

3        114.    By January 31, 2006 (the filing date of the application which later issued as the

4    '429 Patent), the inventors had recognized a need for "an effective way to police secure or

5    encrypted communications between clients and hosts that does not require decryption of the

6    message traffic."  *Id.* at 2:4-6.  Prior to the invention of the '429 Patent, when encrypted

7    communications such as SSL were used, the URL of the host "could not be extracted from the

8    client's request and, short of decrypting that request, the network administrator" could not

9    prevent undesired access.  *Id.* at 6:29-34.  To address this unique problem arising in the context

10   of secure communications over the Internet, the inventors of the '429 Patent developed novel

11   and innovative techniques for "extracting and categorizing [URLs] identifying hosts involved in

12   secure Internet communications without having to decrypt [SSL] communications from clients

13   seeking access to such hosts."  *Id.* at 1:6-10.

14       115.    The claimed inventions of the '429 Patent solve the problem of being unable to

15   police secure communications over the Internet (a problem specifically arising in the realm of

16   computer networks).  Unlike prior approaches, the inventions described and claimed in the '429

17   Patent "mak[e] use of the characteristics of the SSL handshake," such as "information . . . in the

18   server's digital certificate, to determine whether or not to permit communications between the

19   client and the host."  *Id.* at 6:35-39.  These methods were and are a significant improvement over

20   (and patentably distinct from) existing approaches.  *See* Ex. N, '429 Patent Prosecution History,

21   at 405-417.  The approach described and claimed in the '429 Patent overcomes the dilemma

22   posed by secure communications by making use of characteristics of the SSL handshake in a

23   manner that prior approaches could not.  *See* Ex. D, '429 Patent at 6:35-39.  Specifically,

24   "information contained in the server's digital certificate" is used "to determine whether or not to

25   permit communications between the client and the host."  *Id.*

26       116.    As described in the '429 Patent, at the start of an SSL communication, a client

27   transmits a hello message that is received at the proxy/firewall.  In response, the proxy/firewall

28   transmits its own hello message to the same IP address that was identified in the client's initial

BAKER BOTTS L.L.P.

request (i.e., a destination IP address included in the client's hello message, which indicates the entity to which the message is directed). *See id.* at 6:39-52. When the destination server receives the proxy's hello message, it is indistinguishable from any other hello message (i.e., the destination server is unaware that the message is an attempt by the proxy server to determine the destination server's true identity). *See id.* at 7:10-16. The destination server returns a hello message that includes its certificate.

117. According to an inventive technique of the '429 Patent (and in contrast to prior approaches), when the proxy/firewall receives the destination server's certificate, the proxy/firewall extracts information (such as the host name (typically in the form of a URL), the certificate's issuer, or the signature of the issuer) from the certificate, which can then be used to query a URL database. *Id.* at 7:20-23. Where the host name is used, the proxy then uses category information returned from the URL database to determine whether or not to allow the communication between the client and the destination server and/or whether or not to permit tunneled communications between the two (i.e., allow communications to pass encrypted through the proxy/firewall). *Id.* at 7:20-28. For example, if the host is a trusted entity, SSL communications may be tunneled through the proxy/firewall, ensuring privacy for the client/user. *Id.* at 5:40-43. If not, SSL communications may be decrypted at the proxy/firewall to allow them to be subjected to further scrutiny. *Id.* at 5:43-45.

118. This inventive approach is captured at least in Claims 1 and 13 of the '429 Patent, and their respective dependent claims. The claimed approaches are tied to computers (and in particular, secure communications over the Internet) and cannot be performed by a human alone. For example, Claim 1 recites "extracting, at the proxy, information from the digital certificate associated with the Internet host," "categorizing, at the proxy, said Internet host into one or more content categories according to said information extracted from the digital certificate," and "based on the one or more content categories into which the Internet host is categorized, determining, at the proxy, whether to (i) pass encrypted communication between a client and the Internet host through the proxy without decrypting the encrypted communication at the proxy or

BAKER BOTTS L.L.P.

(ii) decrypt the encrypted communication between the client and the Internet host so as to permit examination of the encrypted communication at the proxy."

119.    According to another inventive aspect of the '429 Patent, "referrer header information" in messages passed between clients and servers is used to determine whether or not to permit downloads of content or other information from an Internet host identified in the referrer header.  *Id.* at 8:4-8.  With this technique, the "refer header URL can also be categorized by the proxy/firewall in the manner described above, sometimes permitting access to objects [e.g., images] that otherwise might not be permitted."  *Id.* at 8:57-60; *see also id.* at 8:60-9:3. This inventive approach is captured in independent Claim 10, in which a proxy categorizes the referring source of a request for an object into one or more content categories and determines, based on the one or more content categories into which the referring source is categorized, whether communications should be passed between the client and an Internet host without decryption.    The claimed approach is tied to computers (and in particular, secure communications over the Internet) and cannot be performed by a human alone.

120.    These claim elements, individually or in combination, are unconventional and nothing in the specification describes these concepts as well-understood, routine, or conventional.  To the contrary, the specification describes that with prior approaches "the URL of the host . . . could not be extracted from the client's request and, short of decrypting that request, the network administrator may be unable to prevent the undesired access."  *Id.* at 6:29-34.    Prior approaches therefore lacked "an effective way to police secure or encrypted communications between clients and hosts that does not require decryption of the message traffic."  *Id.* at 2:4-6.  Thus, for example, the steps of "extracting, at the proxy, information from the digital certificate associated with the Internet host," "categorizing, at the proxy, said Internet host into one or more content categories according to said information extracted from the digital certificate," and "based on the one or more content categories into which the Internet host is categorized, determining, at the proxy, whether to (i) pass encrypted communication between a client and the Internet host through the proxy without decrypting the encrypted communication at the proxy or (ii) decrypt the encrypted communication between the client and the Internet so

BAKER BOTTS L.L.P.

as to permit examination of the encrypted communication at the proxy" capture an unconventional approach to policing secure communications that was unknown in the field before the invention of the '429 Patent. These claimed concepts solve the problems described above and provide the advantages and improvements to computers described below.

121. Notably, the claimed inventions of the '429 Patent do not foreclose alternative approaches to policing secure communications. That the claimed inventions of the '429 Patent do not foreclose alternative approaches to managing bandwidth is evidenced by the substantial number of patents that have issued after the disclosure of the '429 Patent had been considered during prosecution of those patents. For example, on information and belief at least 6 U.S. Patents have issued after the disclosure of the '429 Patent was considered during prosecution. *See* Ex. U. Thus, rather than preclude all approaches to policing secure communications, the claimed inventions of the '429 Patent are novel techniques that offered significant technical advantages over alternative approaches, as described in more detail below.

122. The inventions described and claimed in the '429 Patent improve the functioning of the computer systems in which they are implemented. For example, prior to the invention of the '429 Patent, proxy servers and other network entities were unable to effectively police secure or encrypted communications between clients and hosts without decrypting all message traffic. *Id.* at 2:4-6. Decrypting all transmissions, however, made the proxy an attractive target for attacks by third parties seeking to exploit that information and defeated the purpose of providing secure communications in the first instance. The inventions described and claimed in the '429 Patent solved these problems and thereby improved the functioning of the proxy servers in which they were implemented by providing an effective means of policing secure communications without decrypting all traffic.

123. In addition to improving the functionality of existing proxy servers, the claimed inventions of the '429 Patent offered a number of additional technical advantages over prior approaches. As one example, the claimed invention of the '429 Patent allowed "network managers to leverage URL databases used for categorizing servers or other Internet hosts for use

BAKER BOTTS L.L.P.

1   even with SSL communication sessions," something that had not been achieved with prior

2   approaches.  *Id.* at 5:45-48.

3       124.    As another example, the claimed inventions of the '429 Patent enables a proxy to

4   use the URL of the certificate's issuer to make policy decisions, which advantageously allowed

5   the proxy to determine whether the issuer is a recognized and/or trusted issuer.  *Id.* at 7:52-58.

6   This is advantageous in that it may "help prevent fraud, for example, where a host provider has

7   attempted to counterfeit a certificate."  *Id.* at 7:58-59.  As still another example, the claimed

8   inventions of the '429 Patent advantageously enables the proxy to "verify the signature of the

9   issuer as attached to the certificate" in order to confirm the legitimacy of the destination server.

10  *Id.* at 7:59-66.

11      125.    As yet another example, the claimed inventions of the '429 Patent

12  advantageously enables a proxy server to make use of referrer header categorization to

13  permit/deny communications between clients and servers, which can improve the granularity of

14  the URL filtering, "sometime permitting access to objects that otherwise might not be

15  permitted."  *Id.* at 8:57-60.

16      126.    The approaches described and claimed in the '429 Patent represented a

17  significant advance over the prior approaches that were not well-known, routine, or conventional

18  in the field at the time the '429 Patent was filed.  On information and belief, during examination

19  of the application which ultimately issued as the '429 Patent, the patent examiner at the USPTO

20  considered at least 24 U.S. patent documents, as well as one other publication.  *See id.* at Cover

21  Page.  *See also* Ex. N, '429 Patent Prosecution History, at 68, 70-80, 117-127, 161-175, 177,

22  205-206, 208-224, 250, 252-269, 303, 305-325, 363-365, 367-385, 418-421, 423-461

23  (describing search results and references considered).  These include references from IBM,

24  Microsoft Corporation, prior Symantec and Blue Coat solutions, amongst others.  The patent

25  examiner determined that none disclosed or rendered obvious the inventions of the '429 Patent.

26  *See* Ex. N, '429 Patent Prosecution History, at 405-417 (notice of allowance).  Indeed, the

27  examiner stated that "[n]one of the prior art of record, either taken by itself or in any

28

BAKER BOTTS L.L.P.

1    combination, would have anticipated or made obvious the invention of the present application at

2    or before the time it was filed." *Id.* at 415.

3        127.    On information and belief, Zscaler directly infringes one or more claims of the

4    '429 Patent, either literally or under the doctrine of equivalents.  Non-limiting examples of such

5    infringement are provided below, based on the limited information currently available to

6    Symantec.

7        128.    Claim 1 of the '429 Patent recites as follows:

8            A method, comprising:

9            receiving, at a proxy, a client hello message from a client;

10           transmitting, from said proxy to an Internet host, a request for a digital
     certificate associated with the Internet host;

11

12           extracting, at the proxy, information from the digital certificate associated
     with the Internet host;

13
             categorizing, at the proxy, said Internet host into one or more content
14   categories according to said information extracted from the digital certificate,
     said categorizing including maintaining a table at said proxy wherein each
15   Internet host is associated with a category which defines attributes of the Internet
     host or content associated with the Internet host; and
16

17           based on the one or more content categories into which the Internet host is
     categorized, determining, at the proxy, whether to (i) pass encrypted
18   communication between a client and the Internet host through the proxy without
     decrypting the encrypted communication at the proxy or (ii) decrypt the
19   encrypted communication between the client and the Internet host so as to permit
     examination of the encrypted communication at the proxy.
20

21       129.    On information and belief, the Zscaler cloud security platform satisfies each and

22   every limitation of Claim 1.  Zscaler's cloud security platform, including its ZEN component,

23   receive, at a proxy (e.g., a ZEN), a client hello message from a client.  For example, Zscaler's

24   ZEN component receives a client hello message from a client (e.g., a subscriber's computer) in

25   the form of an HTTPS request from the client.  Zscaler's cloud security platform, including its

26   ZEN component, transmit, from the proxy to an Internet host, a request for a digital certificate

27   associated with the Internet host.  For example, Zscaler's ZEN component transmits an HTTPS

28

BAKER BOTTS L.L.P.

request to a destination server thereby initiating an SSL handshake. Zscaler's cloud security platform, including its ZEN component, extracts information from the digital certificate associated with the Internet host. For example, Zscaler's ZEN component receives a certificate from the destination server and reads information from the certificate during validation of the destination server. Zscaler's cloud security platform, including its ZEN component, categorizes the Internet host into one or more content categories according to the information extracted from the digital certificate. For example, Zscaler's ZEN component categorizes URLs into various different classes, supercategories, and categories consistent with information extracted from the destination server's certificate. Zscaler's cloud security platform, including its ZEN component, maintains a table at the proxy wherein each Internet host is associated with a category that defines attributes of the Internet host or content associated with the Internet host. For example, Zscaler's cloud security platform includes a table for each class, supercategory, and category that associates URLs with particular categories. The categories further include attributes that define the Internet host or content associated with the host, such as a description of the "gambling" category that defines attributes of "gambling" sites as "sites that provide online gambling or are related to gambling assistance, training, information, or advocacy." Zscaler's cloud security platform, including its ZEN component, based on the one or more content categories into which the Internet host is categorized, determines whether to (i) pass encrypted communication between a client and the Internet host through the proxy without decrypting the encrypted communication at the proxy or (ii) decrypt the encrypted communication between the client and the Internet host so as to permit examination of the encrypted communication at the proxy. For example, Zscaler's cloud security platform permits SSL configuration such that SSL communications that fall within certain URL categories are passed from the destination server to the client through the ZEN without decrypting the communication. If the SSL communication does not fall within one of the specified URL categories, then the communication is decrypted so that the ZEN can inspect the decrypted communication for, among other things, data leakage, malicious content, viruses, and to enforce policy. As such, the ZEN determines whether to pass

BAKER BOTTS L.L.P.

1  the encrypted SSL communication or decrypt the communication based on the categorization of

2  URLs into content categories.

3      130.    In view of the foregoing, Zscaler directly infringes the '429 Patent in violation of

4  35 U.S.C. § 271(a).

5      131.    On information and belief, both by configuring the ZEN component to operate in

6  a manner that Zscaler knows infringes the '429 Patent and by encouraging customers to use the

7  ZEN component in a manner that Zscaler knows infringes the '429 Patent, Zscaler is inducing

8  infringement of the '429 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of

9  service of this complaint.  For example, Zscaler's marketing literature touts functionality of the

10  ZEN component that falls within the scope of the above-identified claims of the '429 Patent.

11      132.    Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a

12  direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and

13  continues to suffer damages and irreparable harm. Unless Zscaler's acts of infringement are

14  enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

## Count V – Infringement of U.S. Patent No. 8,316,446

16      133.    Symantec incorporates by reference the allegations in Paragraphs 1 through 132

17  above.

18      134.    There are dangers and risks associated with connecting a computer to the

19  Internet, such as computer viruses that spread from computer to computer (for example, using e-

20  mail).  Ex. E, '446 Patent at 1:20-24.  There were also other types of unwanted software that

21  could be harmful to the operation of a computer.  Spyware and Trojans are two examples of

22  these kinds of threats to computer and data safety.  *Id.* at 1:24-25.  "Spyware is malicious code

23  that covertly monitors actions taken on a PC, and reports those activities to an outside entity.

24  For example, spyware can log and report all websites visited by a user, along with other personal

25  data such as passwords, bank accounts, social security numbers, and so on."  *Id.* at 1:25-30.

26  Trojans, meanwhile, "are programs that appear legitimate, but perform some illicit activity when

27  executed," such as locating password information, making a system more vulnerable to

28  subsequent attacks, or destroying programs or data stored on the computer.  *Id.* at 1:31-35.

BAKER BOTTS L.L.P.

Problematically, Trojans often sneak into computer systems disguised in free games or other utilities, and remain in the computer doing damage or permit a third party to take control of the computer. *Id.* at 1:35-40. These are problems that specifically arise in computer networks.

135. Prior approaches to network security were not able to provide adequate protection against these unwanted software downloads. Unwanted software is "often sent as executable files—such as those having .EXE (executable), .COM (command), or .DLL (dynamic linked library) file extensions—or active content files—such as those having .CAB (cabinet) and .OCX (OLE control extension) file extensions. Spyware, however, "may be disguised in some fashion to pass through" a URL scanner, such as "file extensions camouflaged to disguise their true nature." *Id.* at 5:1-6. Likewise, Trojans "often sneak in attached to a free game or other utility." *Id.* at 1:37-38. These features of unwanted software like spyware and Trojans made it difficult for prior network security elements to provide adequate protection against these threats.

136. By April 22, 2005 (the date on which the application which subsequently issued as the '446 Patent was filed), the inventors of the '446 Patent (employees of Blue Coat) recognized the need for a "comprehensive system to block unwanted software downloads and installations." *Id.* at 1:41-42. In particular, the inventors developed new methods and apparatus to block unwanted software downloads, for example at gateway to enterprise or home networks. These methods and systems were and are a significant improvement over (and patentably distinct from) existing approaches to network security, which failed to provide comprehensive protection against unwanted software downloads. *See* Ex. O, '446 Patent Prosecution History, at 23-34.

137. Specifically, the claimed inventions of the '446 Patent provide protection against unwanted software downloads by enabling network devices (such as a proxy server or a firewall) to block unwanted software downloads from Web sites. As described and claimed in the '446 Patent, a proxy server may use a URL filter to categorize a URL from which a download is arriving at the system. Ex. E, '446 Patent at 6:65-7:3. The proxy server can employ a URL database to categorize the URL that originated a download by matching the source URL against the URL database and retrieving the category associated with the source URL. *Id.* at 7:27-30.

For example, a URL may be categorized as a "gaming" site. In some instances, a URL may be categorized on a "blacklist" that may indicate downloads from that URL should be blocked or on a "whitelist" that may indicate downloads from that URL should be allowed.

138. In other cases, however, a URL may not be categorized into either a "blacklist" or a "whitelist" and thus more information may be required to determine whether to block a software download from such a URL. To address this problem, the claimed inventions of the '446 Patent provide for blocking or not blocking an attempted download based on a categorization of the URL from which the download is attempted, the file type of the software being downloaded, and whether downloads of that particular file type are permitted for that category of Web sites. The claimed methods and systems employ a file type identifier "configured to identify the download by file type." *Id.* at 7:38-40. The file type identifier can identify the file type using a file type database that can include a file type extension list associating file types with file extensions and/or a file type signature list that includes signatures of various file types and the file types with which they are associated. *Id.* at 7:52-54, 7:62-65.

139. The use of the file type signatures list is especially advantageous in handling files, such as spyware, that have file extensions camouflaged to disguise their true nature. For example, "to prevent downloads of files that may have file extensions camouflaged to disguise their true nature," the proxy server is "configured to scan incoming files for spyware signatures that cannot be hidden (e.g., through changes in file extensions) and take action according to user-defined spyware policies." *Id.* at 5:1-9. The claimed invention of the '446 Patent leverages the fact that spyware, by its nature, contains certain patterns that the spyware scanner can read in order to identify the true nature of the associated file. *Id.* at 5:10-13. As one example, "a .CAB file will include a header having a certain format," and the file signature list may include information about known characteristics of spyware headers and the like. *Id.* at 5:12-19. The file type identifier can scan the file being downloaded, compare the scanned information with the signature information, and determine the file type based on the signature (even if the file extension has been changed to mask the true nature of the file). *Id.* at 5:19-24, 7:65-8:3.

140.    The proxy server can then block or allow the software download based on the categorization and the file type.   This information can be used in a variety of ways, advantageously providing operators a more flexible and nuanced approach to protecting against unwanted software downloads.  For example, "the blocking decision module can implement a blocking rule to block all .CAB files from URLs on the URL blacklist," whether "the .CAB file was identified by file extension or by signature."  *Id.* at 8:11-14.  "Another blocking rule can block all downloads from non-whitelisted URLs where the file type identified by file extension does not match the file type identified using the signature list."  *Id.* at 8:14-17.  As another example using the "gaming" sites category discussed above, the blocking decision module "can be configured to allow executable (.EXE) files to be downloaded from known gaming sites, but not cabinet (.CAB) files.  Since most online games require downloading some executable code, a .EXE download does not look very suspicious from a site in this category.  However, a .CAB file from a gaming site would highly likely contain unwanted code."  *Id.* at 8:18-25.

141.    This inventive approach is captured in at least in Claims 1, 5, and 8, and their respective dependent claims.  The claimed approaches are tied to computers and cannot be performed by a human alone.  For example, Claim 1 recites "intercepting at a Uniform Resource Locator (URL) filter module of a network device, an attempted download of a file from a URL," "categorizing by the URL filter module of the network device the URL into a URL category according to a URL database," "analyzing by a file type identifier module of the network device the file to determine its file type . . . by detecting one or more of a file type signature in the file and a file extension of the file,"  "identifying the file type based on one or more of the file type signature detected in the file and the file extension of the file," and "blocking or not blocking the attempted download according to a decision output of a blocking decision module of the network device which receives as inputs the URL category and the file type."   If the URL category does not indicate a blacklist or a whitelist, "the URL category specifies a URL content category indicating a type of content provided by the URL and the decision output is based on whether files of said file type are permitted for URLs in the URL content category."

142.    These claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional.  To the contrary, the specification describes that prior approaches to network security were not able to provide adequate protection against unwanted software downloads, and in particular those that "may be disguised in some fashion to pass through" a URL scanner, such as "file extensions camouflaged to disguise their true nature." *See id.* at 5:1-6.  These features of unwanted software like spyware and Trojans made it difficult for prior network security elements to provide adequate protection against these threats.  Thus, for example, the steps of "intercepting at . . . a network device, an attempted download of a file from a URL," "categorizing . . . the URL into a URL category according to a URL database," "analyzing . . . the file to determine its file type . . . by detecting one or more of a file type signature in the file and a file extension of the file," "identifying the file type based on one or more of the file type signature detected in the file and the file extension of the file," and "blocking or not blocking the attempted download according to a decision output of a blocking decision module of the network device which receives as inputs the URL category and the file type" capture an unconventional approach to blocking unwanted software downloads that was unknown in the field before the invention of the '446 Patent.  The functions of the claimed URL filter module, file type identifier module, and blocking decision module recited in the claims, in combination, perform unconventional functions that were not performed in prior systems or methods.  Indeed, these claimed concepts solve the problems described above and provide the advantages and improvements to computers described below.

143.    Notably, the claimed inventions of the '446 Patent do not foreclose alternative approaches to blocking unwanted software downloads.  That the claimed inventions of the '446 Patent do not foreclose alternative approaches to blocking unwanted software downloads is evidenced by the substantial number of patents that have issued after the disclosure of the '446 Patent had been considered during prosecution of those patents.  For example, on information and belief at least 9 U.S. Patents have issued after the disclosure of the '446 Patent was considered during prosecution.  *See* Ex. V.  Thus, rather than preclude all approaches to

blocking unwanted software downloads, the claimed inventions of the '446 Patent are novel techniques that offered significant technical advantages over alternative approaches, as described in more detail below.

144.   The inventions described and claimed in the '446 Patent improve the functioning of the computer networks in which they are implemented.  For example, prior to the invention of the '446 Patent, the performance of computer systems often suffered due to a failure to block unwanted software downloads (such as computer viruses, worms, spyware, and Trojans), leading to system instability, malfunction, and/or loss of critical files.  For example, the damage caused by undetected viruses can range from mildly annoying effects to damage to hardware, software, or files.  As another example, a worm introduced into a computer system can consume too much system memory (or network bandwidth), causing Web servers, network servers and individual computers to stop responding.  As another example, computer systems that have been compromised by a Trojan horse may allow malicious users and/or programs access to the computer system to steal confidential and personal information.  The inventions described and claimed in the '446 Patent solved these problems by providing a comprehensive system to block unwanted software downloads and installations, thereby reducing or eliminating the above-described consequences that can result from unwanted software downloads.

145.   Moreover, the inventions described and claimed in the '446 Patent offered a number of additional technical advantages over prior approaches.  Unlike prior approaches, the claimed invention of the '446 Patent enables URL category and file type of an attempted download to be taken into account in blocking attempted downloads.  This advantageously allows for the implementation of a variety of blocking rules, and permits a more comprehensive approach to protecting against software downloads while permitting flexibility in the rules that are applied to various URLs.  The functioning of the systems (e.g., proxy server or firewall) in which the methods are employed are thereby improved.  As another example, the claimed invention of the '446 Patent provides an effective mechanism for combatting spyware that may be disguised in some fashion to evade existing network security solutions (e.g., spyware having camouflaged file extensions).  Furthermore, the '446 Patent improves existing systems by

BAKER BOTTS L.L.P.

1 allowing them to recognize situations in which the file type extension of an attempted download

2 does not match the file type signature and block or allow the download based on rules tailored to

3 that particular circumstance.

4     146.   The approaches described and claimed in the '446 Patent represented significant

5 advances over prior approaches that were not well-known, routine, or conventional.   On

6 information and belief, during examination of the application which ultimately issued as the

7 '446 Patent, the patent examiner at the USPTO considered at least 33 U.S. patent documents, as

8 well as 4 other publications.  *See id.* at Cover Page.  *See also* Ex. O, '446 Patent Prosecution

9 History, at 36-42, 45-69, 127-145, 176, 179-197, 231, 234-249, 288-299, 302-303, 318-324,

10 356, 359-370, 392, 394-404, 441, 443-447, 485, 487-491 (describing search results and

11 references considered).   These include references describing solutions from Microsoft

12 Corporation and IBM, amongst others.  The patent examiner determined that none disclosed or

13 rendered obvious the inventions of the '446 Patent.  *See* Ex. O, '446 Patent Prosecution History,

14 at 23-34 (notice of allowance).  Indeed, the examiner stated that the "prior art of record does not

15 explicitly teach or fairly suggest, either individually or in combination, file type and file

16 extension of the files are two entities and blocking or not blocking the attempted download

17 according to a decision output of a blocking decision module of the network device which

18 receives as inputs the URL category and the file type, wherein (i) if the URL category indicates

19 a blacklist, the decision output is to block the download, (ii) if the URL category indicates a

20 whitelist, the decision output is to allow the download, otherwise, the URL category specifies a

21 URL content category indicating a type of content provided by the URL, and the decision output

22 is based on whether files of said file type are permitted for URLs in the URL content category,"

23 as described and claimed in the '446 Patent.  *Id.* at 33.

24     147.   On information and belief, Zscaler directly infringes one or more claims of the

25 '446 Patent, either literally or under the doctrine of equivalents.  Non-limiting examples of such

26 infringement are provided below, based on the limited information currently available to

27 Symantec.

28     148.   Claim 1 of the '446 Patent recites as follows:

BAKER BOTTS L.L.P.

Plaintiffs' First Amended Complaint for Patent Infringement - 3:17-cv-04414-JST

1

2

A method, comprising:

intercepting at a Uniform Resource Locator (URL) filter module of a network device, an attempted download of a file from a URL;

3

4

categorizing by the URL filter module of the network device the URL into a URL category according to a URL database;

5

6

7

analyzing by a file type identifier module of the network device the file to determine its file type, wherein the file type of the file is determined by detecting one or more of a file type signature in the file and a file extension of the file, and identifying the file type of the file based on one or more of the file type signature detected in the file and the file extension of the file; and

8

9

10

11

12

blocking or not blocking the attempted download according to a decision output of a blocking decision module of the network device which receives as inputs the URL category and the file type, wherein (i) if the URL category indicates a blacklist, the decision output is to block the download, (ii) if the URL category indicates a whitelist, the decision output is to allow the download, otherwise, the URL category specifies a URL content category indicating a type of content provided by the URL, and the decision output is based on whether files of said file type are permitted for URLs in the URL content category.

13

14

149.    On information and belief, the Zscaler cloud security platform satisfies each and

15

every limitation of Claim 1.  Zscaler's cloud security platform, including its ZEN component,

16

intercepts at a Uniform Resource Locator (URL) filter module of a network device, an attempted

17

download of a file from a URL.  For example, Zscaler's ZEN component inspects files being

18

returned from an Internet host (e.g., www.google.com) to a client.  Zscaler's cloud security

19

platform, including its ZEN component, categorizes by the URL filter module of the network

20

device the URL into a URL category according to a URL database.  For example, Zscaler's ZEN

21

categorizes URLs into URL categories (e.g., the classes, supercategories, or categories used in

22

URL filtering) according to a URL database (e.g., the global URL category database).  Zscaler's

23

cloud security platform, including its ZEN component and its File Type Analysis module,

24

analyzes by a file type identifier module of the network device the file to determine its file type,

25

wherein the file type of the file is determined by detecting one or more of a file type signature in

26

the file and a file extension of the file.  For example, Zscaler's ZEN component analyzes files,

27

such as attachments to e-mails or HTTP transactions, to detect the file type (e.g., executable,

28

Office document, archive file, image, audio, video, etc.) by scanning the files to determine the

file extension (e.g., .exe, .scr, etc.). Zscaler's cloud security platform, including its ZEN component, identifies the file type of the file based on one or more of the file type signature detected in the file and the file extension of the file. As discussed above, for example, Zscaler's ZEN identifies file type by scanning a file to determine the file's extension. Zscaler's cloud security platform, including its ZEN component, blocks or does not block the attempted download according to a decision output of a blocking decision module of the network device which receives as inputs the URL category and the file type. As noted above, for example, the Zscaler's ZEN knows a URL category and a file type. The ZEN will output a decision that either blocks or does not block an attempted download. If the ZEN's File Type Policy specifies a URL category as a blacklist, the ZEN's decision is to block the download. For example, the ZEN may block particular types of files within the webmail URL category if the URL is blacklisted. Alternatively, the ZEN's File Type Policy may indicate that the URL category is whitelisted and not block the download. Otherwise, the URL category specifies a URL content category indicating a type of content provided by the URL, and the decision output is based on whether files of said file type are permitted for URLs in the URL content category. Zscaler utilizes URL content categories in the form of classes, supercategories, and categories. For example, Zscaler utilizes a class of legal liability, a supercategory of adult material, and a category of adult themes. If the File Type Policy does not specify that the file type is allowed or blocked for a particular URL category, the ZEN determines if files of the particular file type are permitted for URLs in the particular URL content category. For example, if no File Type Policy is specified for executable files downloaded from adult themed websites, the ZEN determines whether to block or allow the download based on whether downloading executable files is permitted for URLs within the adult themed URL content category.

150.   In view of the foregoing, Zscaler directly infringes the '446 Patent in violation of 35 U.S.C. § 271(a).

151.   On information and belief, both by configuring the ZEN component to operate in a manner that Zscaler knows infringes the '446 Patent and by encouraging customers to use the ZEN component in a manner that Zscaler knows infringes the '446 Patent, Zscaler is inducing

BAKER BOTTS L.L.P.

1  infringement of the '446 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of

2  service of this complaint.  For example, Zscaler's marketing literature touts functionality of the

3  ZEN component that falls within the scope of the above-identified claims of the '446 Patent.

4       152.    Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a

5  direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and

6  continues to suffer damages and irreparable harm.  Unless Zscaler's acts of infringement are

7  enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

8                  __Count VI – Infringement of U.S. Patent No. 8,402,540__

9       153.    Symantec incorporates by reference the allegations in Paragraphs 1 through 152

10  above.

11       154.    The '540 Patent is generally directed to improved computer, network, and web

12  security.  *See* Ex. F, '540 Patent at Col. 1:66 – 2:3; *see also id.* at 3:14-20.

13       155.    The inventors of the '540 Patent identified a growing technological problem with

14  the way Web and network security was being implemented in the early-to-mid 2000s.  At the

15  time of the filing of the '540 Patent, existing web security systems suffered from technical

16  shortcomings based on those systems' failures to address the evolving use of the Internet and

17  growing prominence of a mobile workforce (i.e., "remote site connectivity").  *See id.* at 2:52-55.

18  The prior approaches of dealing with the "disparate threats" facing a network (e.g., "viruses,

19  attacks by hackers, spyware, phishing, spam, intrusion onto a computer network by unauthorized

20  users, and others"), such as providing a number of different products "that separately

21  address[ed] each of the most prevalent type of threats" or "monolithic networking hardware"

22  systems that "joined together" products that "address each of the most prevalent type of threats,"

23  were still "hardwired to provide a set of services."  *Id.* at 2:5-18, 2:33-37.

24       156.    The inventors of the '540 Patent had the foresight to understand how the

25  Internet's influence in the business landscape would affect web security.  By the early 2000s,

26  companies were depending "upon the Internet for additional business-critical activities like

27  supply chain integration, long-distance communications, and remote site connectivity."  *Id.* at

28  2:52-55.  However, "each Internet-based endeavor potentially open[ed] another door to outside

BAKER BOTTS L.L.P.

hackers and malicious code attacks." *Id.* at 2:55-57. External web access to information on a network, however, was critical to the efficient and effective workings of enterprises." *Id.* at 4:25-26. "Employees, partners, customers, and remote users need timely access using a wide variety of communication methods and devices from all locations. Additionally, the confidentially [sic] and integrity of network resources such as intellectual property, competitively advantaged data, regulated or personal data must be maintained in this open environment. However, threats of attack, intrusion, and espionage may come in a wide variety of forms such as spyware, keystroke loggers, and Trojans, while malware such as worms and viruses must also be detected and prevented." *Id.* at 4:26-36. The '540 Patent recognized that "[n]etwork security management involves balancing a complex array of network participant needs," and that "[p]roviding a network security solution that effectively delivers all of one participant's access needs may impose constraints on one or many other participants' needs such as making critical aspects of the network vulnerable to intrusions." *Id.* at 4:37-51.

157. A potential solution is to physically segment the network using multiple network management devices. However, "[s]ince all, or nearly all of the data accessed and used by internal users, external users, clients, servers, vendors, and the like passes through an organization's network, segmenting the network to address the various needs of the network participants can be costly because of the substantial expense associated with hardware security facilities." *Id.* at 4:52-57. Moreover, "segmenting may not relieve the constraints sufficiently to justify this expense" and "management of segmented, network management devices increases complexity which may create new opportunities for segments being vulnerable to intrusion." *Id.* at 4:57-62. Thus, physically segmenting network participants is "neither practical nor in most cases possible while still delivering effective business solutions throughout the network." *Id.* at 4:63-65. These are problems that specifically arise in computer networks.

158. Accordingly, the inventors of the '540 Patent understood the technical need for "more effective unified threat management techniques" (*Id.* at 3:6-10) while providing a web security solution that was adapted to protect expanding networks and user productivity. *Id.* at 3:6-10. *See also id.* at 2:50-52 ("Companies' computing systems are more interconnected than

ever, with the promise that network expansion will only continue."); 2:61-63 ("[C]ompanies must grapple with how to keep their network safe, without sacrificing growth or productivity."). The inventors of the '540 Patent recognized that "[a]n approach to allow managed separation of aspects of a network security system based on participant criteria may include virtualization of the network." *Id.* at 4:67-5:2. As described in the '540 Patent, network virtualization advantageously allows one or more participants (or participant types) to be "logically connected to the network through a virtual network connection within a network security system," such as a flow processing system implemented at a proxy server. *Id.* at 5:2-6; 21:3-24.

159.    The inventors of the '540 Patent developed a virtualized network security system (VNSS) that provides security policies to data flows received at the VNSS, as well as methods for securing a plurality of virtual networks with a VNSS and configuring virtual network security in a VNSS. These systems and methods were and are a significant improvement over (and patentably distinct from) prior approaches to network security. *See* Ex. P, '540 Patent Prosecution History, at 1148-1156 (notice of allowance). The '540 Patent explains that the VNSS may provide security policies "regardless of the physical arrangement of the network." Ex. F, '540 Patent at 85:42-45. For example, users may connect to the VNSS using the Internet, a VPN, or other wireless connection. *See id.* at 85:57-62. The virtualization may be applied "to provide a logical arrangement of policies, networks, behavioral analyses, applications" and combinations thereof to enable the flow processing facility to "provides its features and functions in ways that are logically beneficial or convenient; logically tailored to data flows or to users of data flows; [and] consistent with an abstract and logical model (as opposed to a literal and physical model)." *Id.* at 21:49-57.

160.    Unlike existing approaches, the virtualized nature of the '540 Patent's security system allows the VNSS to provide a logical arrangement of security policies without having to physically separate the data flow as was required by prior art systems relying on multiple disparate components to provide security. *See id.* at 21:49-52. For example, virtualization may present a server computing facility with "different policies, networks, behavioral analyses, applications, and so on than it provides to a network-connected computing facility." *Id.* at

BAKER BOTTS L.L.P.

1   21:57-61.  The '540 Patent explains that the flow processor may identify a specific data flow

2   coming from a participant and "logically route" the flow "to a virtual network [] associated with

3   that participant" at which point a specific security policy may be applied to the virtual network.

4   *Id.* at 86:26-35.

5        161.   For example, two servers may each communicate with a database over the

6   network.  If the network were physically segmented, "such as with a network security appliance

7   physically residing between the servers and the database, both servers may be subjected to one

8   intrusion detection and prevention policy."  *Id.* at 85:37-42.  However, using the "virtualized

9   network security system" described and claimed in the '540 Patent, multiple virtual networks

10  connected to the database can be supported, regardless of the physical arrangement of the

11  network.  *Id.* at 85:42-45.  Advantageously, "each of the servers in this example may be

12  connected to the database through different virtual networks," and "[t]he security policy on each

13  of the virtual networks may be different and, perhaps, a function of the server's identity."  *Id.* at

14  85:45-49.

15       162.   This inventive approach is captured in at least in Claims 1, 6, and 13 of the '540

16  Patent, and their respective dependent claims.  The claimed approaches are tied to computers

17  and cannot be performed by a human alone.  For example, Claim 13 recites "[a] virtualized

18  network security system (VNSS)" comprising "a plurality of flow processing facilities

19  configured as elements of the VNSS for processing a data flow . . . comprising subscriber profile

20  data," "a first security policy for a first virtual network," "a second security policy for a second

21  virtual network," in which "the plurality of flow processing facilities make a first determination,

22  in accordance with one of the first security policy and the second security policy, of

23  abnormalities that are associated with the data flow, the first determination based at least in part

24  on the subscriber identified by the subscriber profile data" and "the plurality of flow processing

25  facilities make a second determination, in accordance with one of the first security policy and

26  the second security policy, based at least in part on the subscriber identified by the subscriber

27  profile data."

28

BAKER BOTTS L.L.P.

163.    These claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional.  To the contrary, the specification describes that prior approaches to network security failed to provide "a network security solution that effectively delivers all of one participant's access needs" without imposing "constraints on one or many other participants' needs."  *See id.* at 4:47-57.  Potential approaches such as physically segmenting the network were "costly because of the substantial expense associated with hardware security facilities" (*Id.* at 4:52-57), did "not relieve the constraints sufficiently to justify this expense," and increased management complexity in a manner that created opportunities for segments being vulnerable to intrusion.  *Id.* at 4:57-62.  Thus, for example, the elements of a "[a] virtualized network security system (VNSS)" comprising "a plurality of flow processing facilities configured as elements of the VNSS for processing a data flow . . . comprising subscriber profile data," "a first security policy for a first virtual network," "a second security policy for a second virtual network," in which "the plurality of flow processing facilities make a first determination, in accordance with one of the first security policy and the second security policy, of abnormalities that are associated with the data flow, the first determination based at least in part on the subscriber identified by the subscriber profile data" and "the plurality of flow processing facilities make a second determination, in accordance with one of the first security policy and the second security policy, based at least in part on the subscriber identified by the subscriber profile data" captured an unconventional approach to network security that was unknown in the field before the invention of the '540 Patent.  These claimed concepts solve the problems described above and provide the advantages and improvements to computers described below.

164.    Notably, the claimed inventions of the '540 Patent do not foreclose alternative approaches to network security.  That the claimed inventions of the '540 Patent do not foreclose alternative approaches to network security is evidenced by the substantial number of patents that have issued after the disclosure of the '540 Patent had been considered during prosecution of those patents.  For example, on information and belief at least 155 U.S. Patents have issued after the disclosure of the '540 Patent was considered during prosecution.  *See* Ex. W.  Thus, rather

than preclude all approaches to network security, the claimed inventions of the '540 Patent are novel techniques that offered significant technical advantages over alternative approaches, as described in more detail below.

165.    The inventions described and claimed in the '540 Patent improve the functioning of the computer networks in which they are implemented.  For example, prior to the invention of the '540 Patent, network security systems could not effectively meet all of one participant's access needs without imposing constraints on one or many other participants' needs such as making critical aspects of the network vulnerable to intrusions.  *See id.* at 4:47-51.  The inventions described and claimed in the '540 Patent solved these problems and thereby improved the functioning of the networks in which they were implemented by enabling "managed separation of aspects of a network security system based on participant criteria" through virtualization of the network.  *Id.* at 4:67-5:2.  The network virtualization achieved by the solutions claimed in the '540 Patent allowed "one or more participants (or participant types) to be logically connected to the network through a virtual network connection within a network security system such as the flow processing facility."  *Id.* at 5:2-6.  Unlike prior approaches, the virtualized network security system described and claimed in the '540 Patent can be applied "to provide a logical arrangement of policies, networks, behavioral analyses, applications, any and all combinations of the foregoing, and so on" and enable the flow processing facility "to provide its features and functions in ways that are logically beneficial or convenient; logically tailored to data flows or to users of data flows; consistent with an abstract and logical model (as opposed to a literal and physical model); and so forth."  *Id.* at 21:49-57.  Thus, unlike physically segmenting the network, the claimed virtualized network security system permits different policies, networks, behavioral analyses, applications, and so on to be applied to different servers or network-connected computing facilities.  *See id.* at 21:57-61.

166.    The inventions described and claimed in the '540 Patent offered a number of additional technical advantages over prior approaches to network security.  As one example, the claimed virtualized network security system (and methods of securing and configuring such a virtualized network security system) reduce or eliminate the substantial expense associated with

BAKER BOTTS L.L.P.

1   the hardware security facilities required to physically segment a network and avoid the resulting

2   complexity that may leave segments vulnerable to intrusion.  *See id.* at 4:52-62.

3       167.   As another example, the virtualized network security system described and

4   claimed in the '540 Patent advantageously enables the logical arrangements to be "tailored to the

5   data flows; consistent with a wiedly, logical model (as opposed to an unwieldy, physical

6   model)."  *Id.* at 85:23-26.  A further improvement afforded by the virtualization is that "the

7   logical arrangements may be applied programmatically, automatically, and/or transparently with

8   respect to a source and/or sink (i.e. a transmitting computing facility and/or a receiving

9   computing facility) of the data flows," and the virtualization may be provided with respect to a

10  data flow as a function of the source and/or destination IP address of the data flow."  *Id.* at

11  85:26-34.

12      168.   As another example, "[v]irtualization of a networked security deployment may

13  also be used to share network security hardware resources such as a firewall among otherwise

14  separate networks."  *Id.* at 87:14-16.  Associating each separate network with a virtual network

15  allows a network administrator or owner to define a security policy for their network and have

16  the defined security policy applied to network traffic associated with their virtual network.  *See*

17  *id.* at 87:14-21.  Advantageously, the claimed invention of the '540 Patent allows many different

18  kinds of network configurations to be virtualized, such as "individual enterprises leasing security

19  from a security provider."  *Id.* at 87:21-24.

20      169.   As another example, virtualization of network security also facilitates

21  improvements in network security.  For example, a development virtual network that mirrors a

22  user virtual network may be defined such that internet traffic for the user virtual network also

23  propagates to the development virtual network.  *See id.* at 88:11-16.  The security policy for the

24  development virtual network can be updated with experimental intrusion prevention techniques

25  that are being tested without causing intrusion or false rejects on the user virtual network.  *See*

26  *id.* at 88:16-19.

27      170.   As another example, virtualization of network security facilitates "load balancing

28  of resources within a flow processing facility" by enabling data flow associated with one virtual

BAKER BOTTS L.L.P.

1    network to be routed to one of a plurality of application processor modules while routing data

2    flow associated with another virtual network to another application processor module.  *See id.* at

3    88:20-25.

4           171.    The approaches described and claimed in the '540 Patent represented a

5    significant advance over the prior approaches to network security that were not well-known,

6    routine, or conventional in the field at the time the application which lead to the '540 Patent was

7    filed.  On information and belief, during examination of the application which ultimately issued

8    as the '540 Patent, the patent examiner at the USPTO considered at least 64 U.S. and foreign

9    patent documents, as well as 31 other publications.  *See id.* at Cover Page.  *See also* Ex. P, '540

10   Patent Prosecution History, at 821, 823-833, 951-952, 954-960, 1157-1161, 1163-1177, 1214-

11   1217, 1227-1228, 1238-1239, 1246 (describing search results and references considered).  These

12   include references describing solutions from Microsoft Corporation, IBM, Fujitsu, and Lucent

13   Technologies, amongst others.  The patent examiner determined that none disclosed or rendered

14   obvious the inventions of the '540 Patent.  *See* Ex. P, '540 Patent Prosecution History, at 1148-

15   1156 (notice of allowance).  Indeed, the examiner stated that the "closest" prior art "fails to

16   teach or suggest 'processing the data flow received at said first port for the first and second

17   virtual networks through at least one of the plurality of flow processor processors, wherein

18   portions of the data flow that are associated with the first virtual network are processed

19   according to the first security policy, and wherein portions of the data flow that are associated

20   with the second virtual network are processed according to the second security policy, said

21   processing further comprising: making a first determination, in accordance with one of the first

22   security policy and the second security policy, of abnormalities that are associated with the data

23   flow, the first determination based at least in part on the subscriber identified by the subscriber

24   profile data; and making a second determination, in accordance with one of the first security

25   policy and the second security policy, based at least in part on the subscriber identified by the

26   subscriber profile data, and transferring said data flow to said second port," as described and

27   claimed in the '540 Patent.  *Id.* at 1153-1154.

28

172.   On information and belief, Zscaler directly infringes one or more claims of the '540 Patent, either literally or under the doctrine of equivalents.  Non-limiting examples of such infringement are provided below, based on the limited information currently available to Symantec.

173.   Claim 13 of the '540 Patent recites as follows:

A virtualized network security system (VNSS) comprising:

a plurality of flow processing facilities configured as elements of the VNSS for processing a data flow, said data flow being transferred between a first port and a second port of the VNSS, the data flow comprising subscriber profile data;

a network management facility that is networked with the plurality of flow processing facilities; and

a first security policy for a first virtual network, based at least in part on the subscriber profile data included in the data flow;

a second security policy for a second virtual network, based at least in part on the subscriber profile data included in the data flow, wherein the two or more flow processing facilities receive at least one of the first security policy and the second security policy while receiving said data flow on said plurality of first ports and transferring said data flow to said plurality of second ports,

wherein the plurality of flow processing facilities make a first determination, in accordance with one of the first security policy and the second security policy, of abnormalities that are associated with the data flow, the first determination based at least in part on the subscriber identified by the subscriber profile data; and

wherein the plurality of flow processing facilities make a second determination, in accordance with one of the first security policy and the second security policy, based at least in part on the subscriber identified by the subscriber profile data.

174.   On information and belief, the Zscaler cloud security platform satisfies each and every limitation of at least Claim 13.  Zscaler's cloud security platform, including its ZEN component, implements policy enforcement by providing a VNSS.  For example, Zscaler's cloud security platform creates a global network that acts as a single virtual proxy.  Zscaler's cloud security platform, including its ZEN component, includes a plurality of flow processing facilities that are configured as elements of the VNSS for processing a data flow, and the data

1   flow is transferred between a first port and a second port of the VNSS.  As an example,
2   Zscaler's ZEN component uses multiple security analysis engines to analyze traffic.  Once
3   traffic reaches the ZEN component, the security analysis engines scan the content using, for
4   example, Zscaler's ByteScan technology.  Zscaler's cloud security platform, including its ZEN
5   component, also includes a network management facility that is networked with the plurality of
6   flow processing facilities.  As an example, Zscaler's cloud security platform, including its CA
7   component, communicates with the ZEN component and directs traffic to the ZEN component.
8   Zscaler's cloud security platform, including its ZEN component, includes a first security policy
9   for a first virtual network, which is based at least in part on the subscriber profile data included
10  in the data flow, and also includes a second security policy for a second virtual network, based at
11  least in part on the subscriber profile data included in the data flow.  For example, Zscaler's
12  cloud security platform, including its ZEN component, supports group and user policies being
13  provisioned on the Zscaler database to enable Zscaler's cloud security platform, including its
14  ZEN component, to authenticate the user.  Enabling authentication allows Zscaler's cloud
15  security platform, including the ZEN component, to identify the traffic that it receives so it can
16  enforce the configured group and user policies.  Zscaler's cloud security platform, including its
17  ZEN component, also enforces policies with user-level granularity based on defining the policies
18  according to a user or a group.  Zscaler's cloud security platform, including the ZEN
19  component, includes two or more flow processing facilities that receive at least one of the first
20  security policy and the second security policy while receiving the data flow on the plurality of
21  first ports and transferring the data flow to the plurality of second ports.  For example, Zscaler's
22  cloud security platform, including its ZEN component, receives the content and enforces the
23  security policies served by the CA to implement the group and user policies.  Zscaler's cloud
24  security platform includes multiple ZEN components, and the ZEN component includes multiple
25  security analysis engines that scan the content according to the security policies.  Zscaler's cloud
26  security platform, including the ZEN component, include the plurality of flow processing
27  facilities to make a first determination, in accordance with one of the first security policy and the
28  second security policy, of abnormalities that are associated with the data flow.  For example,

BAKER BOTTS L.L.P.

Zscaler's cloud security platform, including its ZEN component, uses Zscaler's ByteScan technology to inspect every byte of a request, content, responses, and all related data for inline blocking threats like viruses, cross site scripting, and botnets.  As another example, Zscaler's cloud security platform, including its ZEN component, inspects all end user traffic through Single Scan Multi Action technology to ensure security against current and emerging threats based on the user provisioning.  Single Scan Multi Action technology subjects the content to every level of inspection unless malicious content is identified at a lower level.  Using Zscaler's cloud security platform, including its ZEN component, the first determination is based at least in part on the subscriber identified by the subscriber profile data.  The plurality of flow processing facilities makes a second determination, in accordance with one of the first security policy and the second security policy, based at least in part on the subscriber identified by the subscriber profile data.  As an example, Zscaler's cloud security platform, including its ZEN component, inspects every byte of traffic inline across multiple security techniques and enforces compliance according to granular user policies. Zscaler's cloud security platform may be configured to enforce multiple security policies, including, but not limited to, web security, advanced threats, and anti-virus and anti-spyware.

175.    In view of the foregoing, Zscaler directly infringes the '540 Patent in violation of 35 U.S.C. § 271(a).

176.    On information and belief, both by configuring the ZEN component to operate in a manner that Zscaler knows infringes the '540 Patent and by encouraging customers to use the ZEN component in a manner that Zscaler knows infringes the '540 Patent, Zscaler is inducing infringement of the '540 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of service of this complaint.  For example, Zscaler's marketing literature touts functionality of the ZEN component that falls within the scope of the above-identified claims of the '540 Patent.

177.    Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and continues to suffer damages and irreparable harm. Unless Zscaler's acts of infringement are enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

BAKER BOTTS L.L.P.

### Count VII – Infringement of U.S. Patent No. 9,525,696

178.    Symantec incorporates by reference the allegations in Paragraphs 1 through 177 above.

179.    The '696 Patent is generally directed to improved systems for protecting computer networks and systems from viruses, attacks form hackers and other unauthorized intrusions, spyware, spam, phishing and other malicious activity. *See* Ex. G, '696 Patent at Col. 1:59-63.

180.    The '696 Patent explains that with prior approaches to dealing with the different types of threats facing a computer network (e.g., "viruses, attacks by hackers, spyware, phishing, spam, intrusion onto a computer network by unauthorized users, and others"), "the protection comes at the expense of processing resources, as each application in a unified threat management suite must use such resources."  *Id.* at 2:7-11.  The protection offered by prior approaches to network security came "either at the expense of processing resources" (e.g., where a software firewall product must be installed on a server) or "at the expense of operational complexity" (e.g., where the firewall product is embodied in a dedicated network device). *Id.* at 2:12-19.  These are problems that specifically arise in computer networks.

181.    The inventors of the '696 Patent recognized that there was a need for "more effective unified threat management techniques" that overcame the shortcoming of prior approaches.  *Id.* at 2:66-67.  To that end, the inventors created a flow processing facility for implementing a security policy to address "a variety of types of threats that relate to computer systems, including computer networks."  *Id.* at 3:8-13.  The flow processing systems of the '696 Patent were and are a significant improvement over (and patentably distinct from) prior approaches to network security.  *See* Ex. Q, '696 Patent Prosecution History, at 703-712 (notice of allowance).  The flow processing facility can, for example, be deployed in a proxy server. Ex. G, '696 Patent at 21:44-59.  The flow processing facility includes a plurality of application processing hardware modules, each of which is configured with an application for processing data packets.  The application processing modules can, for example, include an anti-virus

application, a URL filter, a content filter, a firewall, an intrusion prevention application, and a database protection application. *See, e.g.*, *id.* at Claim 10.

182. A subscriber profile is used to identify data packets associated within the subscriber in a stream of data packets. "This profile may relate an application to a subscriber. In doing so, it may specify access control rules, privileges, and preferences associated with that relation." *Id.* at 37:58-61. The flow processing facility "can store, distribute, modify, act in accordance with, and enforce aspects of the subscriber profile." *Id.* at 37:61-64.

183. The claimed solution utilizes a network processing module that identifies one or more application processing modules for processing data packets based on an association of the application configured on each application processing module with the subscriber profile. The network processing module "can receive and classify data flows" and "the classification may be used to drive a decision process which directs the data flow to an application processor module." *Id.* at 26:59-27:1. The network processing module is able to transmit the data packets to the application processing modules in series or parallel depending on the security policy to be applied. For example, "a data flow may be routed to a firewall application, then to an anti-virus application, then to a URL filter, then back to the firewall." *Id.* at 25:65-67. As another example, a data flow may be duplicated and routed substantially simultaneously to two different applications or network services that are provided by the application processor module. *Id.* at 25:67-26:6. "In one example, one of the duplicates is routed to an intrusion detection application while another duplicate is routed to a URL filter." *Id.* at 26:6-8. *See also id.* at 39:1-25, 85:20-31.

184. The inventive approaches described in the '696 Patent are captured in Claims 1 and 13, and their respective dependent claims. The claimed approaches are tied to computers and cannot be performed by a human alone. For example, Claim 1 recites "[a] flow processing facility for implementing a security policy" comprising "a plurality of application processing hardware modules, each configured with an application for processing data packets," a subscriber profile for identifying data packets associated with the subscriber profile in a stream of data packets," and "a network processing module for identifying one or more of the plurality

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

of application processing modules for processing the identified data packets based on an association of the application configured on each application processing module with the subscriber profile and for transmitting the identified data packets in at least one of series and parallel to the identified application processing modules based on the security policy."

185.   These claim elements, individually or in combination, are unconventional, and nothing in the specification describes these concepts as well-understood, routine, or conventional.  To the contrary, the specification describes that prior approaches to unified threat management detrimentally impacted processing resources because "each application in a unified threat management suite must use such resources."  *Id.* at 2:2-11.  Thus, for example, the elements of the claimed "flow processing facility for implementing a security policy," including the "application processing hardware modules," "subscriber profile," and "network processing module for identifying one or more of the plurality of application processing modules for processing the identified data packets based on an association of the application configured on each application processing module with the subscriber profile and for transmitting the identified data packets . . . to the identified application processing modules based on the security policy" capture an unconventional approach to implementing a security policy in which disparate threat management methods are implemented in a single flow processing architecture that was unknown in the field before the invention of the '696 Patent.  These claimed concepts solve the problems described above and provide the advantages and improvements to computers described below.

186.   Notably, the claimed inventions of the '696 Patent do not foreclose alternative approaches to network security.  That the claimed inventions of the '696 Patent do not foreclose alternative approaches to network security is evidenced by the substantial number of patents that have issued after the disclosure of the '696 Patent had been considered during prosecution of those patents.  For example, on information and belief at least 3 U.S. Patents have issued after the disclosure of the '696 Patent was considered during prosecution.  *See* Ex. X.  Thus, rather than preclude all approaches to network security, the claimed inventions of the '696 Patent are

1    novel techniques that offered significant technical advantages over alternative approaches, as

2    described in more detail below.

3            187.    The inventions described and claimed in the '696 Patent improve the functioning

4    of the computer networks in which they are implemented.  For example, prior to the invention of

5    the '696 Patent, approaches to network security merely "joined together" products "that

6    separately address each of the most prevalent type of threats" in a manner that detrimentally

7    impacted processing resources because "each application in a unified threat management suite

8    must use such resources."  *Id.* at 2:2-11.  The claimed "flow processing facility" solved these

9    problems and thereby improved the functioning of networks in which they were employed by

10   utilizing the claimed network processing module to identify one or more of the plurality of

11   application processing modules for processing the identified data packets based on an

12   association of the application configured on each application processing module with the

13   subscriber profile.  By identifying the application processing modules to use for processing the

14   data packets based on the subscriber profile, and transmitting the identified data packets to the

15   identified application processing modules, the claimed invention of the '696 Patent reduces the

16   amount of resources consumed because the application processing modules used for identified

17   data packets is tailored to the subscriber profile.

18           188.    The inventions described and claimed in the '696 Patent improve the functioning

19   of the computer systems in which they are implemented in other ways.  As described above, the

20   inventors of the '696 Patent recognized that "[a] need exists for more effective unified threat

21   management techniques, including techniques that address critical types of threats.  Critical

22   threats include, for example, viruses, network security holes, network communications, content

23   inspection, intrusions, and other attacks[.]"  *Id.* at 2:66-3:4.  Other threats include "viruses,

24   attacks from hackers and other unauthorized intrusions, spyware, spam, phishing and other

25   scams, malicious activities and code."  *Id.* at 1:60-64.  As a result of these threats, the

26   performance of computer systems often suffered due to the failure to detect malicious code,

27   leading to system instability, malfunction, and/or loss of critical files.  For example, the damage

28   caused by undetected viruses can range from mildly annoying effects to damage to hardware,

BAKER BOTTS L.L.P.

software, or files.  As another example, a worm introduced into a computer system can consume too much system memory (or network bandwidth), causing Web servers, network servers and individual computers to stop responding.  As another example, computer systems that have been compromised by a Trojan horse may allow malicious users and/or programs access to the computer system to steal confidential and personal information.  The inventions described and claimed in the '696 Patent solved these problems by providing "methods and systems for unified threat management, including unified threat management using a flow processing facility that processes a data flow to address patterns relevant to a variety of types of threats that relate to computer systems, including computer networks."  *Id.* at 3:8-15.  The claimed inventions allow for "disparate threat management" to be "implemented in a single flow processing architecture" (*Id.* at 3:16-19) capable of "[e]xposing threats and intrusions within packet payload at or near real-time rates" to enhance "network security from both external and internal sources while ensuring security policy is rigorously applied to data and system resources," thereby reducing or eliminating the above-described consequences that can result from critical types of threats.  For example, the claimed "application processing hardware modules" may comprise "a monitoring application" that may include "at least one intrusion detection application," "a network data processing application" that may comprise "a URL filter, a content filter, a firewall, and an intrusion prevention application," as well as an "an anti-virus application, . . . an intrusion prevention service, and a database protection application."  *See, e.g. id.* at Claims 1-12. Intrusion detection and prevention systems, for example, may include systems or methods "used to keep attackers from gaining access to a network, resources on the network, data on the network, or communication pathways into and out of the network," and "may also provide defense against internal network attacks and help enforce corporate security policies" as well as "detect and prevent misuse from authorized users of a network by enforcing corporate security policies."  *Id.* at 7:2-13.  Indeed, intrusion detection and prevention "can identify and stop network and application-level attacks before they inflict any damage by providing detection and prevention capabilities that result in network operational . . . benefits."  *Id.* at 7:21-25.

189.    Thus, the claimed invention of the '696 Patent offered a number of technical advantages over prior approaches.  The approaches described and claimed in the '696 Patent represented a significant advance over the prior approaches that was not well-known, routine, or conventional.    On information and belief, during examination of the application which ultimately issued as the '696 Patent, the patent examiner at the USPTO considered at least 111 U.S. and foreign patent documents, as well as 46 other publications.  *See id.* at Cover Pages.  *See also* Ex. Q, '696 Patent Prosecution History, at 662-683, 713-736 (describing search results and references considered).    These include references describing solutions from Microsoft Corporation, IBM, Fujitsu, and Lucent Technologies, amongst others.  The patent examiner determined that none disclosed or rendered obvious the inventions of the '696 Patent.  *See* Ex. Q, '696 Patent Prosecution History, at 703-712 (notice of allowance).  Indeed, the examiner stated that "none of the references of record alone or in combination disclose or suggest the combination of the limitations specified," including at least "a network processing module for identifying one or more of the plurality of application processing modules for processing the identified data packets based on an association of the application configured on each application processing module with the subscriber profile and for transmitting the identified data packets in at least one of series and parallel to the identified application processing modules based on the security policy" and "a network processing module for identifying at least one of the one or more application processing modules for processing the identified data packets based on an association of applications configured on each of the one or more application processing modules with the subscriber profile, and for transmitting the portion of the identified data packets in at least one of series and parallel to the applications configured on the identified application processing modules based on the security policy," as described and claimed in the '696 Patent.  *See id.* at 710.  The examiner further stated that "the explicit claiming of the aforementioned limitations" was a "distinct feature of the applicant's claimed invention over the prior art."  *Id.* at 711.

190.    On information and belief, Zscaler directly infringes one or more claims of the '696 Patent, either literally or under the doctrine of equivalents.  Non-limiting examples of such

BAKER BOTTS L.L.P.

infringement are provided below, based on the limited information currently available to Symantec.

191.    Claim 1 of the '696 Patent recites as follows:

A flow processing facility for implementing a security policy, comprising:

a plurality of application processing hardware modules, each configured with an application for processing data packets;

a subscriber profile for identifying data packets associated with the subscriber profile in a stream of data packets; and

a network processing module for identifying one or more of the plurality of application processing modules for processing the identified data packets based on an association of the application configured on each application processing module with the subscriber profile and for transmitting the identified data packets in at least one of series and parallel to the identified application processing modules based on the security policy.

192.    On information and belief, the Zscaler cloud security platform satisfies each and every limitation of at least Claim 1.  Zscaler's cloud security platform, including its ZEN component, implements policy enforcement by providing a flow processing facility for implementing a security policy.  For example, the Zscaler platform is a complete security platform that supports security policies.  Zscaler's cloud security platform, including its ZEN component, includes a plurality of application processing hardware modules, and each is configured with an application for processing data packets.  As an example, Zscaler's ZEN component analyzes traffic using multiple security analysis engines.  Once traffic reaches the ZEN component, the security analysis engines scan the content through, for example, Zscaler's ByteScan technology.  Zscaler's cloud security platform, including its ZEN component, also includes a subscriber profile for identifying data packets associated with the subscriber profile in a stream of data packets.  For example, Zscaler's cloud security platform, including its ZEN component, supports group and user policies being provisioned on the Zscaler database to enable Zscaler's cloud security platform, including its ZEN component, to authenticate the user.  Enabling authentication allows Zscaler's cloud security platform, including the ZEN component, to identify the traffic that it receives so it can enforce the configured group and user policies.

BAKER BOTTS L.L.P.

Zscaler's cloud security platform, including its ZEN component, includes a network processing module for identifying one or more of the plurality of application processing modules for processing the identified data packets based on an association of the application configured on each application processing module with the subscriber profile.  As an example, Zscaler's cloud security platform, including its Central Authority (CA) component, directs traffic to the ZEN component based on the user's location and ensures that the policy is applied according to the user's location, device, application, or content through context-aware security.  The ZEN component implements Zscaler's Single Scan Multiple Action technology to accurately identify the application to use for processing the content.  Zscaler's cloud security platform, including its ZEN component, includes the network processing module that transmits the identified data packets in at least one of series and parallel to the identified application processing modules based on the security policy.  For example, Zscaler's cloud security platform, including the CA component, directs the traffic to the ZEN component, and the ZEN component implements Single Scan Multiple Action technology to identify the security analysis engines to scan the content.

193.   In view of the foregoing, Zscaler directly infringes the '696 Patent in violation of 35 U.S.C. § 271(a).

194.   On information and belief, both by configuring the ZEN component to operate in a manner that Zscaler knows infringes the '696 Patent and by encouraging customers to use the ZEN component in a manner that Zscaler knows infringes the '696 Patent, Zscaler is inducing infringement of the '696 Patent by its customers in violation of 35 U.S.C. § 271(b), at least as of service of this complaint.  For example, Zscaler's marketing literature touts functionality of the ZEN component that falls within the scope of the above-identified claims of the '696 Patent.

195.   Symantec has no adequate remedy at law for Zscaler's acts of infringement.  As a direct and proximate result of Zscaler's acts of infringement, Symantec has suffered and continues to suffer damages and irreparable harm. Unless Zscaler's acts of infringement are enjoined by this Court, Symantec will continue to be damaged and irreparably harmed.

BAKER BOTTS L.L.P.

**PRAYER FOR RELIEF**

WHEREFORE, Symantec prays for judgment in its favor granting the following relief:

A.      A finding that Zscaler has directly infringed and/or induced others to infringe the Patents-in-Suit;

B.      An award of damages pursuant to 35 U.S.C. § 284 adequate to compensate Symantec for Zscaler's infringement of the Patents-in-Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

C.      A preliminary and/or permanent injunction against Zscaler and its officers, agents, servants, employees, and representatives, and all others in active concert or participation with them, from further infringing the Patents-in-Suit;

D.      A finding that Zscaler's infringement of at least the '429 Patent and '446 Patent has been willful.

E.      A declaration that this is an exceptional case within the meaning of 35 U.S.C. § 285, and a corresponding award of Symantec's reasonable attorney fees incurred in connection with the litigation; and

F.      Any additional and further relief the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b) and District of Delaware Local Rule 38.1, Plaintiffs hereby demand a trial by jury on all issues so triable

Dated:  May 21, 2018

Respectfully submitted,
BAKER BOTTS L.L.P.


/s/ *Kurt M. Pankratz*
Kurt M. Pankratz

*Attorneys for Symantec Corporation
and Symantec Limited.*

BAKER BOTTS L.L.P.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on May 21, 2018. As such, this document was served on all counsel who have consented to electronic service.

*/s/ Kurt M. Pankratz*
Kurt M. Pankratz

BAKER BOTTS L.L.P.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28